CITY OF NEW YORK, et al., Plaintiff,

v.

William J. CLINTON, et al., Defendant.

SNAKE RIVER POTATO GROWERS, INC., et al., Plaintiff,

v.

Robert E. RUBIN, et al., Defendant.

Nos. CIV. 97–2393(TFH),
CIV. 97–2463(TFH).

United States District Court,
District of Columbia.

Feb. 12, 1998.

Michael Sean Laane, Arnold & Porter, Washington, DC, for City of New York, New York City Health and Hospitals Corp., Greater New York Hospital Association, Jamaica Hospital Medical Center, District Council 37, American Federation of State, County and Municipal Employees, Local 1199 National Health and Human Service Employees Union.

Neil H. Koslowe, U.S. Dept. of Justice, Washington, DC, for William J. Clinton, Donna E. Shalala, Franklin D. Raines.

Michael Davidson, Washington, DC, for Robert C. Byrd, Daniel Patrick Moynihan, Carl Levin.

Thomas Becket Pahl, Gadsby & Hannah, Washington, DC, for Dan Burton.

Morgan John Frankel, Thomas B. Griffith, Legal Counsel, Washington, DC, for U.S. Senate.

### MEMORANDUM OPINION

THOMAS F. HOGAN, District Judge.

This case requires the Court to adjudge the constitutionality of the Line Item Veto Act. Before reaching the constitutional challenge, however, the Court must first conclude that it has jurisdiction to hear the case, by determining that Plaintiffs in this action have Article III standing. Based on the briefs and exhibits submitted by the parties and *amici curiae*[1], and argument at a hearing conducted on January 14, 1998, the Court finds that these Plaintiffs have demonstrated the requisite injury to have standing; furthermore, it finds that the Line Item Veto Act violates the procedural requirements ordained in Article I of the United States Constitution and impermissibly upsets the balance of powers so carefully prescribed by its Framers. The Line Item Veto Act therefore is unconstitutional.

1. *Amici curiae* briefs were submitted by Senators Robert C. Byrd, Daniel Patrick Moynihan, and Carl Levin, in support of Plaintiffs' motions to declare the Line Item Veto Act unconstitutional; the United States Senate, in support of the constitutionality of the Act; and Congressman Dan Burton, in support of the constitutionality of the Act.

## I. Background

### A. The Line Item Veto Act[2]

Unable to control its voracious appetite for "pork," Congress passed, and the President signed into law, the Line Item Veto Act. Pub.L. No. 104–130, 110 Stat. 1200 (1996).[3] The Act is designed as an amendment to, and an enhancement of, Title X of the Congressional Budget and Impoundment Control Act of 1974 ("ICA"). 2 U.S.C. §§ 681 *et seq.* The ICA authorized the President to defer spending of Congressional appropriations during the course of a fiscal year or other period of availability, as long as Congress intended for those appropriations to be permissive rather than mandatory. *Id.* The President also could propose the total rescission of an appropriation to Congress, but unless Congress approved the rescission, the President was obligated to release the funds. *Id.* §§ 683(b), 688. Because it generally failed to make the rescissions recommended by the President, Congress found this arrangement to be an unsatisfactory mechanism for controlling deficit spending.[4]

As large deficits persisted, Congress considered various amendments to the ICA to alleviate its perceived defects. One proposal, called "expedited rescission," would amend the ICA to streamline the process for Congressional approval of rescissions proposed by the President. *See, e.g.,* H.R. 2164, 102d Cong. (1991). Other proposals included amending the Constitution to give the President a line item veto, *see, e.g.,* H.R.J. Res. 6, 104th Cong. (1995); H.R.J. Res. 4, 103d Cong. (1993), or adopting a congressional procedure for presenting each spending provision to the President as a separate bill, for approval or veto. *See, e.g.,* S. 137, 104th Cong. (1995); S. 238, 104th Cong. (1995).

Congress settled on an "enhanced rescission" proposal, codified in the Line Item Veto Act, that makes Executive rescissions automatic in defined circumstances, subject to congressional disapproval. By making appropriations "conditional" during the period in which the President has authority to veto provisions, and "by placing the onus on Congress to overturn the President's cancellation of spending and limited tax benefits," H.R. Conf. Rep. No. 104–491, at 16 (1996), the Line Item Veto Act reverses the appropriation presumptions under the ICA.

The Line Item Veto Act gives the President the authority to "cancel in whole," at any time within five days (excluding Sundays) after signing a bill into law, (1) "any dollar amount of discretionary budget authority;" (2) "any item of new direct spending;" and (3) "any limited tax benefit." 2 U.S.C. § 691a (1997).

A "dollar amount of discretionary budget authority" is defined as "the entire dollar amount of budget authority" that is specified in the text of an appropriations law or found in the tables, charts, or explanatory text of statements or committee reports accompanying a bill. *Id.* at § 691e(7). An "item of new direct spending" is a specific provision that will result in "an increase in budget authority or outlays" for entitlements, food stamps, or other specified programs. *Id.* at §§ 691e(8), 691e(5). A "limited tax benefit" is a revenue-losing provision that gives tax relief to 100 or fewer beneficiaries in any fiscal year, or a tax provision that "provides temporary or permanent transitional relief for ten or fewer beneficiaries in any fiscal year."[5] *Id.* at § 691e(9).

---

**2.** The Constitutionality of the Line Item Veto Act was litigated in this court a mere six months before the complaints in this case were filed. *See Byrd v. Raines,* 956 F.Supp. 25 (D.D.C.1997). In *Byrd,* Judge Jackson declared the Act unconstitutional. *Id.* On a direct appeal of that District Court decision, the Supreme Court held that appellees, six members of Congress, lacked standing to bring the suit, and therefore vacated the District Court opinion and directed that the complaint be dismissed. *See Raines v. Byrd,* — U.S. —, —, 117 S.Ct. 2312, 2323, 138 L.Ed.2d 849 (1997).

**3.** President Clinton signed the Line Item Veto Act into law on April 9, 1996, it became effective January 1, 1997, and it remains effective until January 1, 2005.

**4.** Since 1974, Presidents have recommended $72.8 billion in rescissions, but Congress has passed legislation rescinding only $22.9 billion. S.Rep. No. 104–13, at 2 (1995).

**5.** The Joint Congressional Committee on Taxation is responsible for identifying cancelable items in tax bills. *Id.* at § 691f.

With respect to any dollar amount of discretionary budget authority, the Act defines "cancel" as "to rescind." *Id.* at § 691e(4)(A). Cancellation of an item of new direct spending or a limited tax benefit prevents it from having "legal force or effect." *Id.* at § 691e(4)(B). Canceled funds may not be used for any purpose other than deficit reduction. *Id.* at §§ 691c(a)-(b).

To exercise cancellation authority, the President must submit a "special message" to Congress within five calendar days of signing a bill containing the item being canceled. *Id.* at § 691a(c)(1). The President's special message must set forth the reasons for the cancellation; the President's estimate of the "fiscal, economic, and budgetary effect" of the cancellation; an estimate of "the ... effect of the cancellation upon the objects, purposes and programs for which the canceled authority was provided;" and the geographic distribution of the canceled spending. *Id.* at § 691a(b). The President may exercise this authority only after determining that doing so will "(i) reduce the Federal budget deficit; (ii) not impair any essential Government functions; and (iii) not harm the national interest." *Id.* at § 691(a)(3)(A).

A cancellation takes effect upon Congress' receipt of the President's special message. *Id.* at § 691b(a). Congress can restore a canceled item by passing a "disapproval bill," which is not subject to the President's Line Item Veto authority, but is subject to the veto provisions detailed in Article I. *Id.* Disapproval bills must comport with the requirements prescribed in Article I, section 7, although the Line Item Veto Act provides for expedited consideration of these bills. *Id.* at §§ 691e(6), 692(c). If a disapproval bill is enacted into law, the President's cancellation is nullified and the canceled items become effective. *Id.* at § 691b(a).

In terms of judicial review, the Line Item Veto Act provides that "[a]ny member of Congress or any individual adversely affected ... may bring an action in the United States District Court for the District of Columbia, for declaratory judgment and injunctive relief on the ground that any provision of [the Act] violates the Constitution." *Id.* at § 692(a)(1). The Act provides for direct appeal to the Supreme Court and directs both Courts "to expedite to the greatest possible extent the disposition of any matter brought under [this provision.]" *Id.* at 692(b)-(c).

## B. Factual Background in *New York City v. Clinton*

The City of New York plaintiffs consist of the City itself, two hospital associations (Greater New York Hospital Association, or GNYHA, and New York City Health and Hospitals Corporation, or NYCHHC), one hospital (the Jamaica Hospital Medical Center), and two unions that represent health care employees (District Council 37, American Federation of State, County and Municipal Employees and Local 1199, National Health and Human Service Employees).

The City of New York plaintiffs' claims arise out of a dispute over Federal Medicaid payments to the State of New York. The Health Care Financing Administration of the Department of Health and Human Services ("HCFA") provides federal financial participation ("FFP") to match certain state Medicaid expenditures. (*See* Brown Decl., Defs.' Ex. 1 at ¶ 3.) The FFP provided by the federal Medicaid program to match state expenditures is reduced by the revenue that the state receives from health care related taxes. *Id.* at ¶ 4. The FFP is not reduced, however, by tax revenue that meets specified criteria, including that the taxes are "broad-based" (*i.e.,* applied to all health care providers within the same class) and "uniform" (*i.e.,* applied equally to all taxed providers). *Id.*

New York State taxes its health care providers and uses this tax revenue to pay for health care for the poor. (*See* Wang Decl., Pls.' Ex. 2 at ¶ 4.) The State exempts certain revenues (*e.g.,* those derived from particular charities) of some health care providers (*e.g.,* the plaintiff health care providers) from the health care provider tax. (*See* van Leer Decl., Pls.' Ex. 3 at ¶ 3.) That is, New York exempts plaintiff health care providers from taxes that other health care providers must pay.

On December 19, 1994, HCFA notified New York State that 19 of its tax programs violated HCFA's requirements. (*See* Dear

State Medicaid Director Letter, Pls.' Ex. 2D.) Since then, New York has submitted over 60 waiver applications to HCFA, which to date have neither been approved nor denied. (*See* Wang Decl., at ¶ 7.) A finding by HCFA that a State's taxes are impermissible effects a disallowance of the State's Medicaid expenditures and allows HCFA to recoup the matching funds that it has already paid to the State. *Id.* at ¶ 6. If HCFA denies a waiver request, the State may appeal the denial to the Departmental Appeals Board. (*See* Brown Dec. at ¶ 6.)

If HCFA ultimately deems New York's taxes impermissible, New York State law provides that those health care providers that were previously excluded from the taxes must pay them retroactively. (*See* Wang Decl. at ¶ 8.) For example, NYCHHC's tax liability is estimated to be more than $4 million for each year at issue. In total, $2.6 billion may be subject to recoupment from New York State. *Id.* at ¶¶ 7–8.

The Balanced Budget Act of 1997, Pub.L. No. 105–33, included a provision, section 4722(c), that would have alleviated this exposure to liability. It established that New York State expenditures derived from certain health care provider taxes qualified for FFP under the Medicaid program. *Id.* at ¶ 9. This section signified that New York State would not have to return the funds in question to HCFA; for Plaintiffs, it meant that they were relieved of their liability to New York State should HCFA deny New York's waiver requests.

The President signed the Balanced Budget Act into law on August 5, 1997. Six days later, he identified section 4722(c) as an item of new direct spending and canceled it, thus reinstating Plaintiffs' exposure to liability. Cancellation No. 97–3, 62 Fed.Reg. 43,263 (1997). The President adopted the Congressional Budget Office's estimate that the cancellation of section 4722(c) would reduce the federal deficit by $200 million in FY 1998. *Id.*

## C. Factual Background in *Snake River Potato Growers, Inc. v. Rubin*

Snake River Potato Growers, Inc. is, according to Plaintiffs, an "eligible farmers' cooperative" within the meaning of section 968 of the Taxpayer Relief Act. (*See* Cranney Decl., Pls.' Ex. 2 at ¶ 9.) Its membership consists of approximately 30 potato growers located throughout Idaho, who each owns shares of the cooperative. Plaintiff Mike Cranney, a potato grower with farms located in Idaho, is a member, Director and Vice Chairman of the cooperative. *Id.* at ¶ 2. Snake River was formed in May 1997 to assist Idaho potato growers in marketing their crops and stabilizing prices, in part though a strategy of acquiring potato processing facilities. *Id.* at ¶ 9. These facilities allow individual growers to aggregate their crops and process and deliver them to market jointly. Furthermore, they allow members to retain revenues formerly paid out to third-party processors. *Id.* at ¶ 13.

On August 5, 1997, the President signed into law the Taxpayer Relief Act, Pub.L. No. 105–34, 111 Stat. 788 ("TRA"). Section 968 of the TRA amended the Internal Revenue Code to allow the owner of the stock of a qualified agricultural refiner or processor to defer recognition of capital gains on the sale of such stock to an eligible farmers' cooperative. That is, it would have allowed a processor to sell its facilities to an eligible cooperative without paying tax currently on any capital gain. The stated purpose of section 968 was to aid farmers' cooperatives in the purchase of processing and refining facilities.[6] (*See* Dear Colleague Letter by Reps. Roberts and Stenholm of 12/1/95, Pls.' Ex. 5.) On August 11, 1997, the President identified this provision as a "limited tax benefit," within the meaning of the Line Item Veto Act, and canceled it. Cancellation No. 97–2, 62 Fed.Reg. 43,267 (1997). In his cancellation message, the President estimated that sellers could have used section 968 to defer paying $98 million in taxes over the next five years, and $155 million over the next ten. *Id.*

---

**6.** Before the passage of section 968, farmers' cooperatives were at a competitive disadvantage vis à vis investor-owned businesses. Co-ops could not exchange their stock for the stock of processing companies, because a cooperative's stock can be held only by its members. (*See* Cranney Decl. at ¶ 15.)

Snake River had actively pursued at least one transaction that could have taken advantage of section 968. In May 1997, when Congress initially was considering the proposals in section 968, Mike Cranney and another officer of Snake River discussed with Howard Phillips, a principal owner of Idaho Potato Packers ("IPP"), the purchase by Snake River of the stock of a company that owned an IPP potato processing facility in Blackfoot, Idaho. (*See* Cranney Decl. at ¶ 19.) Plaintiffs contend that this company would have been a "qualified processor" under section 968 and that a deal with Phillips could have been structured so as to comply with all requirements of section 968. *Id.* at ¶¶ 21–23. Plaintiffs maintain that Phillips was interested in pursuing the sale because he could defer taxes on his gain if section 968 passed. *Id.* at ¶ 23. The negotiations did not continue after the President canceled section 968. *Id.* at ¶ 24.

## II. Justiciability

Before tackling the merits of this case, the Court must first determine whether it has jurisdiction to hear it. Under Article III, section 2 of the Constitution, the federal courts have jurisdiction over a dispute only if it is a "case" or "controversy." *See Raines v. Byrd*, — U.S. —, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). The Supreme Court has regarded the case or controversy prerequisite as a "bedrock requirement" and has observed that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Id. citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454.U.S. 464, 471, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982).

The central jurisdictional requirement that controls the analysis of these consolidated cases is the doctrine of standing. The Supreme Court has emphasized that the standing inquiry is "especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines,* — U.S. at — – —, 117 S.Ct. at 2317–18. It has cautioned,

> "the law of Art. III standing is built on a single basic idea—the idea of separation of powers." In the light of this overriding and time-honored concern about keeping the Judiciary's power within its proper constitutional sphere, we must put aside the natural urge to proceed directly to the merits of this important dispute and to 'settle' it for the sake of convenience and efficiency.

It is with these admonitions soundly in mind that this Court proceeds with its standing analysis regarding the plaintiffs now before it.

### A. Standing

While the Supreme Court has candidly acknowledged that "the concept of 'Article III Standing' has not been defined with complete consistency in all of the various cases decided by this Court which have discussed it,"[7] *Valley Forge Christian College,* 454 U.S. at 475, 102 S.Ct. at 760, certain basic principles have been distilled from the Court's decisions:

> To establish an Art. III case or controversy, a litigant first must clearly demonstrate that he has suffered an "injury in fact." That injury, we have emphasized repeatedly, must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is "distinct and palpable," as opposed to merely "abstract," and the alleged harm must be actual or imminent, not "conjectural" or "hypothetical." Further, the litigant must satisfy the "causation" and "redressability" prongs of the Art. III minima by showing that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements. A

---

**7.** *But see* Ralph Waldo Emerson, *Essays: Self-Reliance* (1841), "A foolish consistency is the hobgoblin of little minds."

federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.

*Whitmore v. Arkansas,* 495 U.S. 149, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (internal citations omitted). Here, the principal standing inquiry is whether Plaintiffs can demonstrate sufficient injury, "actual or threatened." *See Valley Forge Christian College,* 454 U.S. at 472, 102 S.Ct. at 758–59.

Although these plaintiffs do not neatly fit into any category of plaintiffs that the Supreme Court has already found to have standing, this Court finds that they meet the Article III requirements. The President directly injured both the City of New York plaintiffs and the Snake River plaintiffs when he canceled legislation that provided a benefit to them.

### 1. City of New York Plaintiffs[8]

■ Plaintiffs suffered an immediate, concrete injury the moment that the President used the Line Item Veto to cancel section 4722(c) and deprived them of the benefits of that law. The Court thus finds that Plaintiffs have suffered sufficient injury to have Article III standing.

When the President signed the Balanced Budget Act of 1997, section 4722(c) became law. *See La Abra Silver Mining Co. v. United States,* 175 U.S. 423, 454, 35 Ct.Cl. 623, 20 S.Ct. 168, 178–79, 44 L.Ed. 223 (1899). Consequently, every New York State tax program held not to meet HCFA's requirements was deemed permissible by federal legislation. The State's liability was eliminated and the hospitals upon which that liability would fall were exonerated of their burden. Plaintiffs possessed a valuable protection against any liability that otherwise might befall them. This protection constituted a benefit to Plaintiffs. When the President canceled section 4722(c), Plaintiffs were divested of the benefit conferred upon them by the legislation. In the simplest terms, Plaintiffs had a benefit, and the President took that benefit away. That is injury.

Defendants argue that, because there are still administrative options available to Plaintiffs, Plaintiffs were not injured by the President's cancellation of this legislative solution. The Court disagrees. Plaintiffs had two independent avenues that they could have pursued to avoid potential liability: one legislative and one administrative. The legislative approach yielded complete success. The fact that there are two mechanisms that could produce a result does not mean that a party is not injured when one of those mechanisms produces the desired result, and then that result is obliterated. Analogously, if Plaintiffs were pursuing a challenge to a final agency action, the fact that there might also be pending legislation would not deprive them of standing to challenge the final agency action. *See INS v. Chadha,* 462 U.S. 919, 936–37, 103 S.Ct. 2764, 2776–77, 77 L.Ed.2d 317 (1983) (Burger, C.J.) (finding that the existence of other speculative avenues of relief does not constitute a prudential bar to the Court's consideration of a case). The Court finds that the availability of administrative relief does not eliminate Plaintiff's injury in the legislative arena.

Plaintiffs also have shown with reasonable certainty that they will be liable for millions of dollars now that Section 4722(c) has been canceled. Under the current law, it is highly likely that the State of New York will be required to return to HCFA at least some of the funds that HCFA paid to the State. First of all, HCFA has already deemed the taxes impermissible. HHS has stated that in the absence of legislation (like Section 4277(c)), by August 1998, "the Secretary will move forward to complete the process already begun to apply with full force the current law." (Dear State Medicaid Directors Letter, Pls.' Ex. 2D.) Next, to exercise Line Item Veto authority, the President was required to certify that the veto *would* reduce the federal deficit; he complied with that requirement by certifying that cancellation of Section 4277(c) *would* result in a reduction in federal outlays in FY 1998 of

---

**8.** The Court's standing analysis focuses on the plaintiff health care providers. As long as the Court determines that at least one of the New York plaintiffs has standing, it does not need to consider the standing issue as to the other plaintiffs in that action. *See Bowsher v. Synar,* 478 U.S. 714, 721, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986).

$200 million. Cancellation No. 97–3, 62 Fed. Reg. 43,263 (1997). Finally, at a press briefing on the cancellation, Office of Management and Budget Director Franklin Raines described Section 4722(c) as "a provision that provided special relief to the State of New York for provider taxes that *had been determined by HCFA to be illegal* under a 1991 statute." (Pls.' Ex 2C (emphasis added).) Raines added that "New York will not be able" to use the taxes to increase its FFP. *Id.* Thus, this Court concludes that it is more likely than not that the State of New York will be required to refund at least some of the payments it has received from HCFA.

Likewise, the Court finds that Plaintiffs are highly likely to be required to indemnify the State for its HCFA recoupments. Defendants do not dispute that New York State law imposes automatic liabilities upon hospitals and nursing homes upon a finding that New York's provider taxes are not permissible. (*See* Wang Decl., Pls.' Ex. 2 at ¶ 8.) Plaintiffs would avoid liability only in the unlikely event that the State of New York would rescind these laws or decline to enforce them. Again, the Court finds that this scenario is less likely than one in which Plaintiffs are required to indemnify the State.

Therefore, by finding that the City of New York plaintiffs have demonstrated sufficient injury, the Court concludes that they have standing to challenge the constitutionality of the Line Item Veto Act.

### 2. Snake River Plaintiffs

■ Like the City of New York plaintiffs, the Snake River plaintiffs suffered an immediate, concrete injury when the President canceled section 968. Section 968 conferred a benefit on Plaintiffs by putting them on equal footing with investor-owned businesses. Before section 968 was passed, investor-owned businesses could structure acquisitions of processing facilities as tax-deferred stock-for-stock exchanges. Farmers' cooperatives could not exchange their stock because a cooperative's stock can be held only by its members. Section 968 would have allowed sellers to defer capital gains taxes on sales to farmers' co-ops, thus putting co-ops in the same competitive position as investor-owned businesses.[9]

The Supreme Court has held that the inability to compete on an equal basis in the bidding process is injury in fact. *See Northeastern Florida Chapter of the Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). In that case, the Court found that contractors that regularly bid on, and performed, construction work for the City of Jacksonville, and would have bid on designated set-aside contracts but for the restrictions imposed, had standing, even though they failed to allege that they would have been awarded a contract but for the challenged ordinance. Here, regardless of whether Plaintiffs can prove that they would have actually consummated purchases under section 968, they are injured by the fact that section 968 put them on equal footing with their competitors and its cancellation disabled them from competing on an equal basis. When the President canceled section 968, Plaintiffs were divested of the benefit conferred upon them by the legislation and therefore were concretely injured.

In addition, it is highly likely that the Snake River plaintiffs would have been able to take advantage of the benefits conferred by section 968 and that they therefore will be injured by the President's cancellation of it. Snake River Potato Growers, Inc. was formed for the purpose of acquiring potato processing facilities. Although the sellers of processing and refining facilities would be the direct beneficiaries of the capital gains tax deferral, it is likely that the fact that the processors would be able to defer these taxes

---

9. As a simplified example, if an investor-owned business and a farmers' co-op each offered $1 million for a processing plant, the investor-owned business would always prevail because the processor would actually net $1 million from that sale, whereas it would net less than $1 million from the sale to the farmers' co-op, because it would have to pay capital gains tax on that sale. Therefore, to compete for a piece of property with an investor-owned business, the farmers' co-op would have to offer more than the investor-owned business to make up for the capital gains tax that the purchaser would have to pay.

would benefit Plaintiffs in a concrete way.[10] For example, in a deal in which there are no other prospective purchasers, even if a seller chose to completely absorb the monetary benefits of the capital gains tax deferral, the fact that the seller would be able to defer the taxes would, at the very least, likely give Plaintiffs some room to negotiate in terms of price; in a competitive situation, it would allow Plaintiffs to pay a lower purchase price than they would have in a scenario in which they were not on equal footing with the other would-be purchasers.[11]

While Plaintiffs cannot demonstrate with certainty that they would be able to take advantage of the benefits provided by section 968, such certainty is not required. In *Bryant v. Yellen,* 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980), for example, farm workers wishing to purchase land had standing even though they could not with certainty establish that they would be able to purchase it. In that case, a reclamation law forbid delivery of reclamation project water to any irrigable land held in private ownership by one owner in excess of 160 acres. If this law were enforced, owners of land in excess of 160 acres would probably sell their excess acreage and would probably be forced to sell at below current market prices. The Court reasoned that farm workers who desired to purchase farmlands in the area had standing, because it was "unlikely" that the owners of excess lands would sell at below-market prices without the law, and it was "likely" that excess lands would become available at less than market prices if the law were applied.

Likewise, the Snake River plaintiffs need only show that the existence of section 968 would have made it more likely that they could acquire processing and refining facilities. As illustrated above, by putting Plain-

tiffs on equal footing with other bidders, it is likely that Plaintiffs would be able to make a purchase by offering less than they would have without the benefit of section 968. Also, the tax deferral would, at the very least, give Plaintiffs more room to negotiate in terms of price. Thus, section 968 would have helped the Snake River plaintiffs in their efforts to purchase processing and refining facilities.

Defendants argue that Plaintiffs cannot meet the redressability requirement of the standing doctrine. They cite *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), and *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), to support their contention that there is no way for the Court to know whether any sellers would be motivated by the benefits of section 968 to sell to Plaintiffs. This case is distinguishable from *Simon* and *Allen,* however, because here, Plaintiffs have sufficiently demonstrated that if this Court struck the Line Item Veto Act and reinstated section 968, they would be more likely to be able to competitively bid on, and prevail in purchasing, processing and refining facilities.

In *Simon,* the Supreme Court determined that low-income plaintiffs lacked standing to challenge a tax regulation establishing the amount of free medical care that a charitable hospital must provide to maintain its tax-exempt status. The Supreme Court explained that it was "purely speculative" to assume that the challenged regulation caused charitable hospitals to provide less service than they would otherwise provide free of charge, and it was "equally speculative" to assume that increasing the amount of free service required for tax exemption would in fact increase the amount of free service provided. *Simon,* 426 U.S. at 42–43, 96 S.Ct. at

---

**10.** Defendants argue that because Plaintiffs themselves would not have received the capital gains tax deferral, they are not the beneficiaries of section 968. The Court disagrees. The express purpose of section 968 was to help farmers to buy refining and processing facilities by eliminating a tax obstacle facing sellers who sell to them. Thus, although the direct recipient of the tax deferral was the sellers, it was plainly understood that the intention was to benefit the farmers; a cancellation of the tax deferral would

really injure the farmers, not the owners of the processing plants, because the owners could already get the tax deferral simply by selling to investor-owned businesses.

**11.** For example, in the illustration provided in footnote 9, *supra,* instead of having to offer, say, $1.3 million to compete with the investor-owned business, the co-op could offer an amount in the $1 million range.

1926–27. The Court commented that · the hospitals might elect to forgo favorable tax treatment to avoid the financial drain of providing more free treatment.

In *Allen,* the Supreme Court concluded that parents of public school children lacked standing to challenge the legality of a tax exemption that benefitted racially discriminatory private schools. The plaintiffs claimed that the tax exemption made it easier for white children to enroll in private schools, the result being that the public schools were less diverse, to the plaintiffs' detriment. The Supreme Court indicated that it would be "entirely speculative" to conclude that withdrawal of the tax exemption would lead any private school to change its exclusionary policies. *Allen,* 468 U.S. at 758, 104 S.Ct. at 3328.

In both of these cases, there was arguably some disincentive to the institutions' taking advantage of the tax benefit. The hospitals in *Simon* would have to admit more non-paying patients; the schools in *Allen* would have to admit a more diverse student body, against their wishes. In these cases, it may indeed have been speculative to attempt to determine whether the hospitals and schools would be willing to make these changes in order to take advantage of the tax incentive. Here, Defendants do not allege that there is any "cost" to the selling processors and refiners in taking advantage of the tax benefits that section 968 would offer. Unlike the schools and hospitals in *Allen* and *Simon,* the sellers' decision likely would be a purely financial one.

Defendants also contend that Plaintiffs' submissions regarding Mike Cranney's planned purchase of the IPP processing facility are barren of facts that would demonstrate whether section 968 would have had any impact on that transaction, because of the specific requirements of section 968 [12]. While the Court will not speculate as to whether Cranney's deal with Phillips would have been brought to fruition but for the

President's cancellation of section 968, or even if that particular deal would have satisfied the requirements of section 968, the negotiations at the very least make it clear to the Court that Plaintiffs were actively spending their time and money pursuing purchases and that the President's cancellation of section 968 interfered with those plans. *Compare, Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (holding that plaintiffs lacked standing to challenge an environmental regulation because, although plaintiffs had a desire to return to the habitat of certain endangered species, they failed to present any concrete plans of an actual visit).

The Court finds that the Snake River plaintiffs suffered an injury when the President canceled Section 968. Plaintiffs lost the benefit of being on equal footing with their competitors and will likely have to pay more to purchase processing facilities now that the sellers will not being able to take advantage of section 968's tax breaks. The Court therefore concludes that the Snake River plaintiffs have demonstrated sufficient injury to have Article III standing.

### III. Constitutional Analysis of the Line Item Veto Act

Having determined that it has jurisdiction to hear this case, the Court now turns to the merits of Plaintiffs' constitutional challenges. The Court begins with the presumption that the Line Item Veto Act is valid. *See, e.g., INS v. Chadha,* 462 U.S. 919, 944, 103 S.Ct. 2764, 2781, 77 L.Ed.2d 317 (1983). The *Chadha* Court cautioned, however,

> The fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution. Convenience and efficiency are not the primary objectives—or the hallmarks—of democratic government …

*Id.*

The Court's constitutional analysis is two-fold. First, the Court examines the Line

---

**12.** To qualify for a deferral of capital gains taxes under section 968(g), the seller must transfer 100% of the stock of the qualified processor to the farmers' cooperative. Section 968(a) requires that, during the one-year period preceding the date of sale, the qualified refiner or processor

purchase at least 50% of the products to be refined or processed from the farmers who make up the eligible farmers' cooperative that is purchasing the corporations' stock or from the cooperative itself.

Item Veto Act in terms of the procedural requirements set forth in Article I, section 7; next, the Court discusses the doctrine of separation of powers. The Court concludes that the Line Item Veto Act fails both of these examinations.

## A. Procedural Requirements of Article I

The Constitution carefully prescribes certain formal procedures that must be observed in the enactment of laws. The Line Item Veto Act impermissibly attempts to alter these constitutional requirements through mere legislative action.[13] Because the Act violates Article I's "single, finely wrought and exhaustively considered, procedure," *Chadha*, 462 U.S. at 951, 103 S.Ct. at 2784, it is unconstitutional.

Article I, section 7 of the Constitution sets forth dual requirements for the enactment of statutes: bicameral passage and presentment to the President. *See* U.S. Const. art. I, § 7, cl. 2 ("Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it . . .") (the Bicameralism and Presentment Clauses). The considerations behind the Great Compromise, under which one House was viewed as representing the People and the other, the States, dictated that the Bicameralism and Presentment Clauses would serve essential constitutional functions. "By providing that no law could take effect without the concurrence of the prescribed majority of the Members of both Houses, the Framers reemphasized their belief . . . that legislation should not be enacted unless it has been carefully and fully considered by the Nation's elected officials." *Chadha*, 462 U.S. at 948–49, 103 S.Ct. at 2783. At the heart of the notion of bicameralism is the requirement that any bill must be passed by both Houses of Congress in exactly the same form.

■ The Constitution requires that both the amendment and repeal of statutes also conform with these Article I requirements. *Chadha*, 462 U.S. at 954, 103 S.Ct. at 2785–86. It makes only four narrow exceptions to this single mechanism by which the provisions of a law may be canceled. *See*, U.S. Const. art. I, § 2, cl. 5; art. I, § 3, cl. 6; art. II, § 2, cl. 2. Congress may not add to this exclusive list without amending the Constitution. In the words of the *Chadha* court,

> The bicameral requirement, the Presentment Clauses, the President's veto, and Congress' power to override a veto were intended to erect enduring checks on each Branch and to protect the people from the improvident exercise of power by mandating certain prescribed steps. To preserve those checks, and maintain the separation of powers, the carefully defined limits on the power of each Branch must not be eroded. To accomplish what has been attempted [here] requires action in conformity with the express procedures of the Constitution's prescription for legislative action: passage by a majority of both Houses and presentment to the President.

*Chadha*, 462 U.S. at 957–58, 103 S.Ct. at 2787.

■ Here, while the initial passage of the Balanced Budget Act and the Taxpayer Relief Act complied with the Article I requirements, the Line Item Veto Act then authorized the President to violate those requirements by producing laws that had not adhered to those requirements. Both Houses of Congress, through a process of discussion and compromise, had agreed upon the exact content of the Balanced Budget Act and the Taxpayer Relief Act. These laws reflected the best judgment of both Houses. The laws that resulted after the President's line item veto were different from those consented to by both Houses of Congress. There is no way of knowing

---

**13.** This approach has been cautioned against since the founding of our democracy. "If in the opinion of the People, the distribution or modification of the Constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the Constitution designates. But let there be no change by usurpation; for though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed." George Washington, Farewell Address, September 19, 1796 *in* 35 *The Writings of George Washington* 229 (John C. Fitzpatrick ed., 1940).

whether these laws, in their truncated form, would have received the requisite support from both the House and the Senate. Because the laws that emerged after the Line Item Veto are not the same laws that proceeded through the legislative process, as required, the resulting laws, are not valid.

Furthermore, the President violated the requirements of Article I when he unilaterally canceled provisions of duly enacted statutes. Unilateral action by any single participant in the law-making process is precisely what the Bicameralism and Presentment Clauses were designed to prevent. Once a bill becomes law, it can only be repealed or amended through another, independent legislative enactment, which itself must conform with the requirements of Article I. Any rescissions must be agreed upon by a majority of both Houses of Congress. The President cannot single-handedly revise the work of the other two participants in the lawmaking process, as he did here when he vetoed certain provisions of these statutes.

Defendants, curiously, contend that, despite its title, the Line Item Veto Act does not authorize the President to "veto" anything. They maintain that under the Act, "[t]he Bill stays as law, unless the President were to exercise his constitutional power to veto. Nothing changes about the bill. The law remains law.... The law remains on the books and the law remains valid." (Tr. of Mot. Hr'g, Jan. 14, 1998 at 71, 78.) The Court does not follow Defendants' logic. In the words of Richard Cardinal Cushing, "When I see a bird that walks like a duck and swims like a duck and quacks like a duck, I call that bird a duck." Whatever defendants wish to call the President's action, it has every mark of a veto. The Line Item Veto Act states explicitly that "cancel" means "to rescind" or to render the provision as having no "legal force or effect." How a "canceled" provision "remains on the books" and "remains valid" defies logic. The only way to restore these canceled provisions is for Congress to pass and present new bills according to the procedure prescribed in Article I. Clearly, this is an indication that the canceled law no longer exists. Therefore, despite Defendants' contentions, the Court finds that when the President canceled these provisions pursuant to his Line Item Veto authority, he unilaterally repealed duly enacted provisions and amended duly enacted laws, which Article I does not permit him to do.

■ Finally, Congress' "indirect attempt[ ] to accomplish what the Constitution prohibits ... accomplishing directly" cannot stand. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 829, 115 S.Ct. 1842, 1867, 131 L.Ed.2d 881 (1995). "To argue otherwise is to suggest that the Framers spent significant time and energy in debating and crafting Clauses that could be easily evaded." *Id.* at 831, 115 S.Ct. at 1868. Congress knew that a simple Line Item Veto, performed prior to the President's signature, would violate Article I's requirement that the president sign or return the bills *in toto*. *See Line Item Veto: The President's Constitutional Authority. Hearing on S. Res. 195 Before the Subcomm. on the Constitution of the Comm. on the Judiciary*, 103d Cong. (1994). This limitation on the President has been clear since George Washington's tenure. *See* 33 *Writings of George Washington* 96 (John C. Fitzpatrick ed. 1940) ("From the nature of the Constitution, I must approve all the parts of a Bill, or reject it in toto.") Congress cannot evade this long-accepted requirement by merely changing the timing of the President's cancellation.

Because the Line Item Veto Act produced laws in violation of the requirement of bicameral passage, because it permitted the President unilaterally to repeal or amend duly enacted laws, and because it impermissibly attempts to evade the requirement that the President sign or reject a bill *in toto*, the Act violates the requirements of Article I. For that reason alone, the Line Item Veto Act is unconstitutional.

### B. Separation of Powers

Furthermore, the Line Item Veto Act is unconstitutional because it impermissibly disrupts the balance of powers among the three branches of government.[14] The separation of

---

14. While this analysis focuses on the balance of

powers between the legislative and executive

powers into three coordinate branches is central to the principles on which this country was founded. *See, e.g., Mistretta v. United States,* 488 U.S. 361, 380, 109 S.Ct. 647, 659, 102 L.Ed.2d 714 (1989). The declared purpose of separating and dividing the powers of government was to "diffuse power the better to secure liberty." *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952). In writing about the principle of separated powers, Madison stated, "No political truth is certainly of greater intrinsic value or is stamped with the authority of more enlightened patrons of liberty." *The Federalist No. 47,* at 324 (J. Cooke ed.1961). Madison later wrote, "But the great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department, the necessary constitutional means, and personal motives, to resist encroachments of the others." *The Federalist No. 51,* at 349 (J. Cooke ed.1961). The Framers "regarded the checks and balances that they built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Buckley v. Valeo,* 424 U.S. 1, 122, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976).

Pursuant to the doctrine of separated powers, certain functions are divided between the legislative and executive branches. Article I, section 1 vests all legislative authority in Congress. Legislative power is the authority to make laws. *Myers v. United States,* 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). Executive power, on the other hand, is to "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. With regard to lawmaking, the President's function is strictly a negative one: to veto a bill in its entirety.

■ While it is Congress' duty to make laws, Congress can delegate certain rulemaking authority to other branches, as long as that delegation is appropriate to the duties of

that branch. *See Mistretta,* 488 U.S. at 388, 109 S.Ct. at 663–64. Congress may not, however, delegate its inherent lawmaking authority. *See, e.g., Loving v. United States,* 517 U.S. 748, ——, 116 S.Ct. 1737, 1744, 135 L.Ed.2d 36 (1996) ("[T]he lawmaking function belongs to Congress ... and may not be conveyed to another branch or entity."); *Field v. Clark,* 143 U.S. 649, 692, 12 S.Ct. 495, 504, 36 L.Ed. 294 (1892) ("That Congress cannot delegate legislative power to the president is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution."); Edward Gibbon, *History of the Decline and Fall of the Roman Empire* 33 (1838) ("The principles of a free constitution are irrecoverably lost, when the legislative power is nominated by the executive."); Sir William Blackstone, 1 *Commentaries on the Laws of England,* 146 (9th ed., reprinted 1978) (1783) ("In all tyrannical governments the supreme magistracy, or the fight of both *making* and of *enforcing* the laws, is vested in one and the same man, or one and the same body of men; and wherever these two powers are united together, there can be no public liberty.").

The line between permissible delegations of rulemaking authority and impermissible abandonments of lawmaking power is a thin one. As one court described the distinction, "The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend." *Field,* 143 U.S. at 694, 12 S.Ct. at 505. Stated another way, "The true distinction ... is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." *Hampton v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928).

branches, the Line Item Veto could also affect judicial independence. It is possible that the President might use the Line Item Veto to manipulate the judiciary's budget, thus exerting pressure on its members. *See* Robert Destro, *Whom Do You Trust? Judicial Independence, the Power of the Purse & the Line Item Veto,* 44–Jan. Fed. Law. 26, 29 (1997).

■ The Line Item Veto Act impermissibly crosses the line between acceptable delegations of rulemaking authority and unauthorized surrender to the President of an inherently legislative function, namely, the authority to permanently shape laws and package legislation. The Act enables the President, in his discretion, to pick and choose among portions of an enacted law to determine which ones will remain valid. The Constitution, however, dictates that once a bill becomes law, the President's sole duty is to "take care that the laws be faithfully executed." His power cannot expand to that of "co-designer" of the law—that is Congress' domain. Any subsequent amendment of a statute falls under Congress' responsibility to legislate. The President cannot take this duty upon himself; nor can Congress relinquish that power to the Executive Branch.

The Defendants contend that the Line Item Veto is no different than the many delegations of legislative authority that Congress has made in the past. *See, e.g., Field v. Clark,* 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294. Unlike other delegations of Congressional authority, however, the Line Item Veto Act authorizes the President to permanently extinguish laws. These laws cannot be revived even if the President (or his successor) feels that they are needed. Further, the Line Item Veto Act empowers the President to make permanent changes to the text of the Internal Revenue Code, as he did in the Snake River case. Such delegations are unprecedented.

Defendants further urge the Court to find that the Line Item Veto provides the President with "intelligible standards" as required by the delegation doctrine. *See Mistretta,* 488 U.S. at 372, 109 S.Ct. at 654–55. While it is true that the delegation doctrine has enjoyed a liberal reading in the last 60 years or so, *see, e.g., Federal Radio Comm'n v. Nelson Bros.,* 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933) (upholding a delegation based on "public convenience, interest or necessity"), by trying to bypass the maxim that Congress can delegate authority only if that authority is, in fact, delegable, the Government attempts to "leap a chasm in two bounds." (Benjamin Disraeli, Earl of Beaconsfield.) It is irrelevant whether the Line Item Veto Act provides intelligible principles in its delegation of authority to the President because, as discussed above, the Act impermissibly attempts to transfer non-delegable legislative authority to the Executive Branch.

The separation of powers between the President and Congress is clear:

> In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute.

*Youngstown,* 343 U.S. at 587–88, 72 S.Ct. at 866–67. By ceding inherently legislative authority to the President, the Line Item Veto Act violates this constitutional framework. For that reason, and for the reason that it violates the letter and spirit of the procedural requirements of Article I, the Line Item Veto Act is unconstitutional.

### IV. Conclusion

Although the Line Item Veto Act may have presented an innovative and effective manner in which to control runaway spending by Congress, the Framers held loftier values. The *Chadha* Court recognized this tension between uncomplicated administration of government and the values honored in the Constitution:

> The choices we discern as having been made in the Constitutional convention impose burdens on governmental processes that often seem clumsy, inefficient, even unworkable, but those hard choices were consciously made by men who had lived under a form of government that permitted arbitrary governmental acts to go unchecked. There is no support in the Constitution or decisions of this court for the proposition that the cumbersomeness and delays often encountered in complying with explicit Constitutional standards may be avoided, either by the Congress or by

the President. With all the obvious flaws of delay, untidiness, and potential for abuse, we have not yet found a better way to preserve freedom than by making the exercise of power subject to the carefully crafted restraints spelled out in the Constitution.

*Chadha,* 462 U.S. at 959, 103 S.Ct. at 2788. Because the Line Item Veto impermissibly violates the central tenets of our system of government, it cannot stand.

Therefore, because the Court finds that Plaintiffs have demonstrated the requisite injury to have standing and, furthermore, that the Line Item Veto Act violates the provisions of Article I, section 7 of the United States Constitution and the separation of powers doctrine, this Court declares that the Line Item Veto Act is unconstitutional. Accordingly, the Court will grant Plaintiffs' Motions for Summary Judgment and deny Defendants' Motion to Dismiss and Motion for Summary Judgment.