*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| STATE OF ALASKA, OFFICE OF LIEUTENANT GOVERNOR, DIVISION OF ELECTIONS and DIRECTOR GAIL FENUMIAI, in an official capacity, | ) ) ) ) ) ) | Supreme Court No. S-17706 Superior Court No. 3AN-19-10903 CI |
| Appellants, | ) ) ) | O P I N I O N No. 7542 – July 16, 2021 |
| v. | ) ) | |
| RECALL DUNLEAVY, | ) ) | |
| Appellee. | ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric Aarseth, Judge.

Appearances: Margaret Paton Walsh, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellants. Jahna M. Lindemuth, Scott M. Kendall, and Samuel G. Gottstein, Holmes Weddle & Barcott, PC, Anchorage, Susan Orlansky, Reeves Amodio LLC, Anchorage, and Jeffrey M. Feldman, Summit Law Group, Anchorage, for Appellee.

---

\*       Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

Before: Winfree, Stowers, Maassen, and Carney, Justices, and Eastaugh, Senior Justice.* [Bolger, Chief Justice, not participating.]

MAASSEN, Justice.
STOWERS, Justice, dissenting in part.

## I. INTRODUCTION

A recall committee submitted an application to the director of the Alaska Division of Elections seeking to recall the governor. The application cited lack of fitness, incompetence, and neglect of duties as grounds for recall and made four different allegations of how those grounds were met. The director refused to certify the application, asserting that it was not legally or factually sufficient.

The committee challenged the director's decision in the superior court. That court granted summary judgment for the committee, deciding that except for one allegation, which it struck, the allegations in the committee's application were legally and factually sufficient. The committee was allowed to move on to the second phase of signature-gathering on its recall petition; if it was successful, the director would call a special election to allow the voters to decide whether the governor should be recalled.

The State appealed, and we affirmed the superior court's decision in a summary order with an opinion to follow. We explain in this opinion why the committee's recall application satisfied the legal requirements for presentation to the voters.

## II. FACTS AND PROCEEDINGS

The Alaska Constitution authorizes the people to recall elected officials and directs the legislature to establish the grounds and procedures for recall.[1] In September

---

[1]     Art. XI, § 8; *see* AS 15.45.470-.720 (providing statutory framework for
(continued...)

-2-                                                                                    **7542**

2019, after gathering the requisite number of signatures,[2] the Recall Dunleavy recall committee filed an application with the Division of Elections to recall Governor Mike Dunleavy.[3]  The application contained this statement of grounds:[4]

> Neglect of Duties, Incompetence, and/or Lack of Fitness, for the following actions:
>
> Governor Dunleavy violated Alaska law by refusing to appoint a judge to the Palmer Superior Court within 45 days of receiving nominations.
>
> Governor Dunleavy violated Alaska law and the Constitution, and misused state funds by unlawfully and without proper disclosure, authorizing and allowing the use of state funds for partisan purposes to purchase electronic advertisements and direct mailers making partisan statements about political opponents and supporters.
>
> Governor Dunleavy violated separation-of-powers by improperly using the line-item veto to:  (a) attack the judiciary and the rule of law; and (b) preclude the legislature from upholding its constitutional Health, Education and Welfare responsibilities.
>
> Governor Dunleavy acted incompetently when he mistakenly vetoed approximately $18 million more than he told the legislature in official communications he intended to strike. Uncorrected, the error would cause the state to lose over $40 million in additional federal Medicaid funds.

---

[1]     (...continued) recall).

[2]     *See* AS 15.45.500(3) (requiring number of signatures on recall petition "equal in number to 10 percent of those who voted in the preceding general election").

[3]     *See* AS 15.45.480 (providing that recall process is initiated by filing of application).

[4]     *See* AS 15.45.510 (listing grounds for recall).

References: AS 22.10.100; Art. IX, sec. 6 of Alaska Constitution; AS 39.52; AS 15.13, including .050, .090, .135, and .145; Legislative Council (31-LS1006); ch.1-2, FSSLA19; OMB Change Record Detail (Appellate Courts, University, AHFC, Medicaid Services).[5]

By letter dated November 4, 2019, the Division's director notified the recall committee that she was denying certification of their application. The director cited the attorney general's advice that although the application met "the technical requirements of the recall statutes," it was "not substantially in the required form" as required by AS 15.45.550(1) because "the statement of grounds for recall [was] not factually and legally sufficient for purposes of certification."[6]

The recall committee challenged the director's decision by bringing this lawsuit.[7] The parties filed cross-motions for summary judgment,[8] and in January 2020 the superior court concluded that, with one exception, the recall application should have been certified. The court found that each of the recall application's allegations described with particularity for-cause grounds for recall with the exception of the third paragraph's

---

[5] *See* AS 15.45.500(2) (requiring that "grounds for recall [be] described in particular in not more than 200 words"). Here, the attorney general's advice to the director gave an approximate word count of 189 including the "references section" but "not including subsection letters such as (a) or (b), and with statutory citations treated as one word (i.e., 'AS #')." That the count is under 200 words appears undisputed.

[6] *See* AS 15.45.550 (listing bases for denial of certification).

[7] *See* AS 15.45.720 (providing right to judicial review of Division's determination).

[8] *See* Alaska R. Civ. P. 56(c) (allowing summary entry of judgment without trial when undisputed facts demonstrate party is entitled to judgment as matter of law).

subpart (b), which the court struck.[9]  The court ordered the Division to prepare petition booklets containing the four legally sufficient allegations.[10]  The State filed this appeal.[11]

We held oral argument on March 25, 2020, then asked the parties for supplemental briefing on issues raised by the recall application's third paragraph about an alleged violation of the separation of powers:  the historical basis of the line-item veto, constitutional limits on the line-item veto, and the legal framework we should use in analyzing the third paragraph's legal sufficiency.

On May 8, after considering the supplemental briefs, we issued an order affirming the superior court's decision of the issues now on appeal.  This opinion explains our reasoning.

## III.    THE CONSTITUTIONAL AND STATUTORY BASIS FOR RECALL

"The Alaska Constitution provides that all political power is inherent in

---

[9]        Paragraph 3(b) alleged, "Governor Dunleavy violated separation-of-powers by improperly using the line-item veto to . . . preclude the legislature from upholding its constitutional Health, Education and Welfare responsibilities."  The superior court held that this allegation did not implicate a prescribed ground for recall:  because the Legislature has the ability to override a Governor's veto, "a Governor can never prevent the Legislature from fulfilling its Constitutional duties with his/her veto power."  The superior court amended the third allegation to read:  "Governor Dunleavy violated separation-of-powers by improperly using the line-item veto to attack the judiciary and the rule of law."

[10]        *See* AS 15.45.560.  The superior court later entered a stay on the preparation of booklets pending this appeal.  We lifted the stay, and the recall committee began the second phase of signature gathering on February 21.  *See* AS 15.45.610 (providing that a petition may be filed "only if signed by qualified voters equal in number to 25 percent of those who voted in the preceding general election").

[11]        An independent expenditure group, Stand Tall With Mike, participated in the proceedings in the superior court but chose not to participate in this appeal.

Alaska's people and 'founded upon their will only.' "[12]   The people exercise their political power in a number of ways, including by voting in state and local elections,[13] rejecting legislative acts by referendum, and legislating directly by initiative.[14]   As a corollary to the constitutional right to elect their leaders, the people have the right to petition to recall those they earlier put in office.[15]   Article XI, section 8 of the Alaska Constitution provides:

> All elected public officials in the State, except judicial officers, are subject to recall by the voters of the State or political subdivision from which elected.  Procedures and grounds for recall shall be prescribed by the legislature.

The right of recall, along with the referendum and the initiative, gives "voters a check on the activities of their elected officials above and beyond their power to elect another

---

[12]     *Meyer v. Alaskans for Better Elections*, 465 P.3d 477, 478 & n.1 (Alaska 2020) (quoting Alaska Const. art. I, § 2 ("All political power is inherent in the people. All government originates with the people, is founded upon their will only, and is instituted solely for the good of the people as a whole.")).

[13]     Alaska Const. art. V, § 1 ("Every citizen of the United States who is at least eighteen years of age, who meets registration residency requirements which may be prescribed by law, and who is qualified to vote under this article, may vote in any state or local election.").

[14]     Alaska Const. art. XI, § 1 ("The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum."); *see also* AS 15.45.010-.245 (providing procedures for law-making by initiative); AS 15.45.250-.465 (providing procedures for approving or rejecting legislative acts by referendum).

[15]     *See Unger v. Horn*, 732 P.2d 1275, 1277 (Kan. 1987) (explaining nearly identical provision in Kansas Constitution:  "The electors are as qualified to determine the capability and efficiency of their elected officials, after giving those officials an opportunity to perform the duties of their offices, as they were when they first selected the officials to fill the positions.").

candidate when the incumbent's term expires."[16]

## A. The Constitutional Source Of The Right To Recall Elected Officials

The right to recall elected officials appeared in the American political system in the early 1900s, "frequently as a companion to the initiative and referendum."[17] The right was codified in Alaska territorial law; the listed grounds for recall were malfeasance, misfeasance, and nonfeasance.[18] The right was preserved at the Alaska Constitutional Convention preceding statehood. A drafting committee initially proposed a provision that reflected territorial law and listed four specific grounds for recall: malfeasance, misfeasance, nonfeasance, and conviction of a crime involving moral turpitude.[19]

Convention debates illustrate the tension between prescribing specific boundaries for the right of recall and leaving its scope completely to the voters. The convention first discussed changing "a crime involving moral turpitude" to just "a crime" in order to give the voters more latitude.[20] Delegate John Hellenthal, who proposed the amendment, argued that "[a]ny crime should be the grounds for recall and then leave it to the good judgment of the people to determine whether the crime was severe enough

---

[16]     *Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 294 (Alaska 1984).

[17]     *Id.*

[18]     *Id.* (citing ch. 90, SLA 1949).

[19]     Constitutional Convention Committee's Proposal No. 3 (Dec. 9, 1955) ("Section 6. Every elected public official in the State, except judicial officers, is subject to recall by the voters of the State or subdivision from which elected. Grounds for recall are malfeasance, misfeasance, nonfeasance, or conviction of a crime involving moral turpitude. The legislature shall prescribe the recall procedures.").

[20]     *See* 2 Proceedings of the Alaska Constitutional Convention (PACC) 1207-16 (Jan. 4, 1956).

for them to warrant signing the petition."[21]  Delegate Ralph Rivers opposed the amendment, arguing that an official should not be subject to recall for misdemeanors such as minor traffic offenses or jaywalking.[22]  The delegates voted down the amendment.[23]

Delegate Vic Fischer then proposed deleting the specified grounds for recall in favor of allowing the voters to decide in each instance whether the grounds alleged by recall proponents were sufficient.[24]  Delegate Hellenthal supported this amendment, noting that no other state's constitution prescribed the grounds for recall;[25] he argued that the convention could always amend the provision later to give that task to the legislature.[26]  The delegates agreed to delete the specified grounds.[27]

---

[21]     *Id.* at 1207-08 ("[A] public official unlike an ordinary citizen should be beyond reproach, and irrespective of the nature of the crime he should be subject to recall.  That does not mean he has to be recalled if he commits a crime, but he should be subject to recall.").

[22]     *Id.* at 1209-10.

[23]     *Id.* at 1212.

[24]     *Id.* at 1214-15 ("[E]very public official should be liable to recall for whatever grounds the people feel are justified. . . . Let['s] leave it to the people.  If they feel a man should be kicked out of his job, let the people do it.").

[25]     *Id.* at 1216.

[26]     *Id.* ("If there is any doubt about whether the grounds can be properly prescribed by the legislature, a very simple amendment to line 7 adding the words, 'The legislature shall prescribe the recall procedure and grounds' therefore would solve it.").

[27]     2 PACC 1222 (Jan. 5, 1956).

The delegates next discussed whether they should direct the legislature to provide the grounds for recall by statute or let the voters decide on a case-by-case basis.[28] Delegate Fischer again urged that it be left to the voters,[29] though he proposed that the constitutional provision include more procedural detail.[30] Other delegates voiced concern about covering too much ground in the Constitution and spending too much of the convention's time on minutiae.[31] Delegate Fischer's amendment was rejected.[32]

Delegate Barrie M. White proposed another amendment allowing the people to determine the grounds for recall.[33] He argued that "[t]he vital part of the recall movement . . . is that the people retain not only the right to recall a public official but to name the reasons for instituting such action and let the action itself stand or fall on the

---

[28]     *Id.* at 1222, 1233-34.

[29]     *Id.* at 1233-34.

[30]     Delegate Fischer proposed specifying the number of signers needed for a valid recall petition, requiring a 200-word statement of the grounds for recall, and specifying the time within which a recall election should be held. *Id.* at 1233. He also recommended amending the section to specifically authorize the legislature to prescribe additional procedures. *Id.* at 1234.

[31]     *See, e.g.*, *id.* at 1234 (statement of Del. Frank Barr) ("Some of us forget that we were sent here to write a constitution, not to make detailed laws."); *id.* at 1235 (statement of Del. Robert J. McNealy) ("[I]f we continue we may not have the best constitution in the United States but we will sure have the longest."); *id.* (statement of Del. Irwin L. Metcalf) (stating he would vote against this amendment and comparing it to modern technology that may be "modern today and outmoded tomorrow."); *id.* (statement of Del. Douglas Gray) ("I believe the authority for the recall is all that is necessary, and the legislature can take care of this affair. I just feel that putting through another recall [amendment] will take another three or four days in this delegation.").

[32]     *Id.* at 1237.

[33]     *Id.*

merits of the case."[34] Delegate James Hurley disagreed: "I think it is fair to leave it to the legislature to prescribe the grounds under which a recall petition should be circulated so as to prevent circulation of recall petitions for petty grounds in local jurisdictions by some recalcitrant officer who was not elected, which I have seen happen in my own community."[35]

The convention ultimately adopted the language now in Article XI, section 8, leaving it to the legislature to prescribe the grounds and procedures for recall.[36] And despite the delegates' "spirited debate" on the subject,[37] no consensus emerged about what the grounds for recall should be. Without substantive guidance on this issue from the Constitution's framers, the Alaska legislature in 1960 first prescribed the grounds and procedures for recall of state officials now codified in AS 15.46, and in 1972 it first prescribed the grounds and procedures for recall of local officials now codified in AS 29.26.[38]

B.     The Statutory Procedures For Recall Of Elected Officials

In the various states with a right of recall, the people's power spans a spectrum. "At one end of the spectrum is the view that recall is 'special, extraordinary, and unusual,' and produces the 'harsh' result of removing an official prior to the

---

[34]     *Id.*; *Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 295 (Alaska 1984).

[35]     2 PACC 1238-39 (Jan. 5, 1956); *Meiners*, 687 P.2d at 295.

[36]     2 PACC 1239-40 (Jan. 5, 1956); *Meiners*, 687 P.2d at 295.

[37]     *Meiners*, 687 P.2d at 295; *see generally* 2 PACC 1207-16, 1221-40 (Jan. 4 & 5, 1956).

[38]     *See* ch. 83, §§ 9.71-.96, SLA 1960 (establishing grounds and procedures for recall); ch. 118, § 2, SLA 1972. The local official recall statutes, originally codified at AS 29.28, were later renumbered to AS 29.26. *See* ch. 74, § 9, SLA 1985.

expiration of the fixed term to which he was elected."[39] Under this view, statutory grounds are construed narrowly in favor of the officeholder, and any violation of the prescribed procedures may invalidate the recall effort.[40] "At the other end of the spectrum" is the view that recall is essentially a political process and "all doubts are resolved in favor of placing the recall question before the voters."[41] Under this view, disagreement with the officeholder's position on policy questions is a sufficient ground for recall.[42]

Alaska "appears to follow a middle ground between these two positions."[43] The statutes effectuating the constitutional right at the state level, AS 15.45.470-.720, set out the grounds and procedures for recalling the governor, the lieutenant governor, and members of the state legislature. They adopt a for-cause recall and list the four acceptable grounds as (1) lack of fitness, (2) incompetence, (3) neglect of duties, and (4) corruption.[44]

---

[39] *Meiners*, 687 P.2d at 294 (quoting *State ex rel. Palmer v. Hart*, 655 P.2d 965, 967 (Mont. 1982)).

[40] *Id.* (citing *Kotar v. Zupan*, 658 P.2d 1095 (Mont. 1983)).

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] AS 15.45.510. Nineteen states and the District of Columbia permit recall of state officials; seven of these states, including Alaska, require cause to initiate a recall. *Recall of State Officials*, NAT'L CONF. ST. LEGISLATURES (July 8, 2019), http://www.ncsl.org/legislatures-elections/elections/recall-of-state-officials.aspx. *See* Minn. Const. art. VIII, § 6 (limiting recall to "serious malfeasance or nonfeasance during the term of office in the performance of the duties of the office or conviction during the term of office of a serious crime"); R.I. Const. art. IV, § 1 (limiting recall to instances (continued...)

The recall process begins when recall proponents file an application with the director of the Division of Elections.[45] The application must include "the grounds for recall described in particular in not more than 200 words," along with the signatures of enough voters to equal "10 percent of those who voted in the preceding general election."[46] "The director shall review the application and shall either certify it or notify the recall committee of the grounds of refusal."[47] Grounds of refusal identified by statute

---

[44] (...continued)
when official has been "indicted or informed against for a felony, convicted of a misdemeanor, or against whom a finding of probable cause of violation of the code of ethics has been made by the ethics commission"); Wash. Const. art. I, § 33 (limiting recall to comission of "some act or acts of malfeasance or misfeasance while in office, or . . . violat[ion of] oath of office"); Ga. Code Ann. §§ 21-4-3(7), 21.4-4(c) (limiting recall to "acts of malfeasance or misconduct while in office"; violations of "oath of office"; "failure to perform duties prescribed by law"; or "willful[] misuse[], conver[sion], or misappropriat[ion], without authority, public property or public funds entrusted to or associated with the elective office to which the official has been elected or appointed"); Kan. Stat. § 25-4302 (limiting recall to "conviction of a felony, misconduct in office or failure to perform duties prescribed by law"); Mont. Code Ann. 2-16-603 (2019) (limiting recall to "[p]hysical or mental lack of fitness, incompetence, violation of the oath of office, official misconduct, or conviction of" certain felony offenses); Va. Code Ann. § 24.2-233 (limiting recall to "neglect of duty, misuse of office, or incompetence in the performance of duties when that neglect of duty, misuse of office, or incompetence in the performance of duties has a material adverse effect upon the conduct of the office," or "[u]pon conviction of" certain crimes). Virginia's process is initiated by citizen petitions but involves a recall trial rather than an election. Va. Code Ann. § 24.2-235; *Recall of State Officials*, NAT'L CONF. ST. LEGISLATURES. At least 30 states allow recall elections in local jurisdictions. *Recall of State Officials*, NAT'L CONF. ST. LEGISLATURES.

[45] AS 15.45.480.

[46] AS 15.45.500(2) and (3).

[47] AS 15.45.540.

include that "the application is not substantially in the required form";[48] the official was very recently elected or is soon to leave office;[49] the official "is not subject to recall";[50] and there are too few qualified signers.[51] If the application is accepted, the director prepares enough petitions "to allow full circulation throughout the state" (in the case of a statewide election),[52] and the recall proponents must gather signatures on the petitions equal in number to "25 percent of those who voted in the preceding general election."[53]

If the proponents gather enough signatures in this second round and the completed petitions are properly filed, the director must call a special election.[54] The ballot asks the yes or no question, "Shall (name of official) be recalled from the office of . . . ?"[55] The targeted official may file a "statement of not more than 200 words . . . in justification of the official's conduct in office,"[56] and copies of the statements for and against recall must appear "in a conspicuous place" at each polling place.[57]

---

[48]     AS 15.45.550(1).

[49]     AS 15.45.550(2) (providing that certification must be denied if the application is filed within first 120 days or last 180 days of official's term of office).

[50]     AS 15.45.550(3).

[51]     AS 15.45.550(4).

[52]     AS 15.45.560.

[53]     AS 15.45.610.

[54]     AS 15.45.650.

[55]     AS 15.45.660.

[56]     AS 15.45.680.

[57]     *Id.*

## IV.  STANDARD OF REVIEW

"We review grants of summary judgment de novo."[58]  We apply our independent judgment to questions of law, including questions of constitutional interpretation.[59]  When interpreting Alaska's recall statutes, we exercise our independent judgment and adopt "the rule of law which is most persuasive in light of precedent, policy and reason."[60]

## V.  DISCUSSION

### A.  Our Case Law Interpreting The Recall Statutes

We have interpreted Alaska's recall statutes twice before, though not the specific statutes at issue here.  Because this case involves a state official, it is governed by AS 15.45.470-.720, but our two reported opinions were decided under AS 29.26.240-360, governing recall of local officials.[61]  The separate statutory schemes arise from the same constitutional background, however, and there are significant statutory parallels that help shape our analysis here.  The three prescribed grounds for recall under the local-official recall statutes are "misconduct in office, incompetence, or failure to perform prescribed duties."[62]  And the local-official recall statutes have a particularity

---

[58]    *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 516 (Alaska 2014).

[59]    *Wielechowski v. State*, 403 P.3d 1141, 1146 (Alaska 2017).

[60]    *von Stauffenberg v. Comm. for Honest & Ethical Sch. Bd.*, 903 P.2d 1055, 1059 n.9 (Alaska 1995) (quoting *Zsupnik v. State*, 789 P.2d 357, 359 (Alaska 1990)).

[61]    *See Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 291 (Alaska 1984); *von Stauffenberg*, 903 P.2d at 1057-58.  We note that *Meiners* was originally decided under AS 29.28, which was later renumbered in 1985.  *See supra* note 38.

[62]    AS 29.26.250.

requirement similar to that of AS 15.45.500(2), though it has evolved slightly.[63] Originally the statute required that a recall petition contain "a statement of the grounds of the recall stated with particularity as to specific instances"; the current version in the local-official recall statutes requires "a statement in 200 words or less of the grounds for recall stated with particularity."[64]

In 1984, in *Meiners v. Bering Strait School District,* we reversed a superior court's order enjoining a recall election directed at several members of a regional school board.[65] The injunction was based on a finding that there were not enough signers, but the superior court also "intimated" that certain allegations in the recall petition, "while sufficiently specific, did not come within the statutory grounds for recall."[66]

We described the constitutional background of the recall process, then observed that holding recall petitions to high standards of technical compliance could hinder the exercise of this constitutional right by citizens of limited means and resources.[67] We emphasized "the need to avoid wrapping the recall process in such a tight legal straitjacket that a legally sufficient recall petition could be prepared only by

---

[63]     *Compare* former AS 29.28.150(a)(3) (1984) ("stated with particularity"), *with* AS 15.45.500(2) ("described in particular").

[64]     AS 29.26.260(a)(3).

[65]     687 P.2d at 290.  Recall of regional school board members is provided for in AS 14.08.081, which incorporates the statutes governing recall of city and borough officials, former AS 29.28.130-.250 (1984).  *Id.* at 290-91.

[66]     *Id.* at 293.

[67]     *Id.* at 295-96 (stating that if we interpret "statutes in so strict a manner" that a recall proponent must seek the advice of a lawyer in order to have a compliant petition, the effect "would be virtually to negate the recall process" for voters in rural Alaska).

an attorney who is a specialist in election law matters."[68] We held that the recall statutes should therefore be "liberally construed so that 'the people [are] permitted to vote and express their will,' " and that "[t]he purposes of recall are . . . not well served if artificial technical hurdles are unnecessarily created by the judiciary as parts of the process prescribed by statute."[69]

The first paragraph of the recall application at issue in *Meiners* alleged that the school board members failed "to perform the[ir]prescribed duties" by failing "to hold the superintendent responsible" for misappropriation of money.[70] The school district argued that a regional school board is legally required only to "employ" a superintendent;[71] "[t]o 'control' the superintendent" was "merely a discretionary function" and the board's failure to do it therefore could not be a failure to perform prescribed duties.[72] We rejected that argument, holding that "[i]mplicit in the board's duty to 'employ' a superintendent" are the duties to evaluate the superintendent's performance and replace him when necessary.[73]

The recall application's second paragraph alleged that the school board members failed to perform prescribed duties by failing "to provide full and open

---

[68]     *Id.* at 301.

[69]     *Id.* at 296 (first alteration in original) (citation omitted) (quoting *Boucher v. Engstrom*, 528 P.2d 456, 462 (Alaska 1974)).

[70]     *Id.* at 291.

[71]     *Id.* at 299-300.

[72]     *Id.* at 300.

[73]     *Id.*

communication between themselves and the voters of the district."[74]  The application

listed particular instances of conduct which it alleged violated the state public records

and public meetings laws.[75]  We concluded that because public records laws were laws

of general application, the allegation that the board failed to follow them sufficiently

alleged the failure to perform prescribed duties.[76]  We rejected the argument that the

petition misstated the law, concluding that the "proper forum" for that argument was the

targeted officials' rebuttal statement.[77]

We emphasized in *Meiners* "that it is [the role] of the voters . . . to assess

the truth or falsity of the allegations in the petition," and that in holding that the petition

sufficiently alleged failure to perform prescribed duties, we were not deciding that the

allegations were true.[78]  We explained:

> We are in a position similar to a court ruling on a motion to
> dismiss a complaint for failure to state a claim.  For these
> purposes, we must take the allegations as true, without
> thereby prejudging the trier of fact's role to determine
> whether or not they are true.[79]

Applying this standard, we held that paragraph two also satisfied the particularity

---

[74]  *Id.* at 301.

[75]  *Id.*

[76]  *Id.*

[77]  *Id.* ("If the petition alleges violation of totally non-existent laws, then it would not allege failure to perform prescribed duties.  But that is not the case here. Where the petition merely characterizes the law in a way different than the official (or his or her attorney) would prefer, he or she has an opportunity to put his or her rebuttal before the voters, alongside the charges contained in the petition.").

[78]  *Id.* at 300 n.18.

[79]  *Id.*

requirement.[80] We explained that "[t]he purpose of the requirement of particularity is to give the officeholder a fair opportunity to defend his conduct in a rebuttal limited to 200 words."[81] The recall petition was not impermissibly vague, because it alleged violations of certain laws and the meaning of those laws was not unclear.[82]

Eleven years later we decided *von Stauffenberg v. Committee for Honest & Ethical School Board*.[83] A borough school board went into executive session to discuss the retention of an embattled school principal; back in public session, the board announced that he was retained.[84] A group of parents and other voters initiated a recall effort against members of the board.[85] Their application stated the grounds for recall as misconduct in office and failure to perform prescribed duties based on the "improper, closed door executive session, in violation of Alaska law."[86] The borough clerk rejected the petition, determining that it "was 'insufficient for failure to allege, with particularity, facts that constitute any of the three grounds for recall.' "[87] The superior court reversed, but we agreed with the borough clerk's determination that the petition was insufficient.[88]

---

[80]     *Id.* at 302.

[81]     *Id.*

[82]     *Id.*

[83]     903 P.2d 1055 (Alaska 1995).

[84]     *Id.* at 1056-57.

[85]     *Id.* at 1057.

[86]     *Id.*

[87]     *Id.* (quoting borough clerk's determination).

[88]     *Id.* at 1057, 1060-61.

We repeated our standard of review from *Meiners*: In reviewing the legal sufficiency of allegations in recall petitions, we are "in a position similar to a court ruling on a motion to dismiss a complaint for failure to state a claim" and must therefore take the allegations as true.[89] We must then "determine whether such facts constitute a prima facie showing of" a prescribed ground for recall.[90]

We concluded in *von Stauffenberg* that they did not, because the school board members did not violate Alaska law.[91] Although government meetings are required to be open, an exception applies when the subject of discussion tends to prejudice the reputation and character of any person, as was the case with the principal's retention.[92] We explained, "[W]here recall is required to be for cause, elected officials cannot be recalled for legally exercising the discretion granted to them by law."[93] The school board members were properly exercising the discretion granted to them by law when they went into an executive session to consider whether to retain the principal.[94] We held that the recall application lacked sufficient particularity because "the allegations fail[ed] to state why entering into the executive session [violated] Alaska law."[95]

---

[89] *Id.* at 1059 (citing *Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 300-01 n.18 (Alaska 1984)).

[90] *Id.* at 1059-60.

[91] *Id.* at 1060.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *Id.*

**B.     The Legal Sufficiency Requirement**

It is a relatively straightforward ministerial task to determine whether a recall petition satisfies certain statutory requirements, such as whether it has "the name and office of the person to be recalled," the requisite number of signatures, and the identity of the recall committee.[96]  More difficult is determining whether the petition is legally sufficient — that is, whether it states one of the four listed grounds for recall[97] — and, if so, whether the grounds are "described in particular."[98]  We address legal sufficiency first and then the particularity requirement.

"In reviewing the legal sufficiency of allegations in recall petitions, this court is 'in a position similar to a court ruling on a motion to dismiss a complaint for failure to state a claim . . . [and] we must [therefore] take the allegations as true.'"[99]  Taken as true, the allegations must make a prima facie showing of at least one of the statutorily prescribed grounds for recall: lack of fitness, incompetence, neglect of duties, or corruption.[100]  If the ground rests on an alleged violation of law, it must allege conduct that is in fact unlawful.  The ground is not legally sufficient if it "alleges violation of totally non-existent laws"[101] or if it is based on the official's lawful exercise of

---

[96]     AS 15.45.500(1), (3), (4).

[97]     AS 15.45.510.

[98]     AS 15.45.500(2).

[99]     *von Stauffenberg*, 903 P.2d at 1059 (alterations in original) (quoting *Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 300-01 n.18 (Alaska 1984)).

[100]     AS 15.45.510.

[101]     *See Meiners*, 687 P.2d at 301.

discretion.[102] However, "a petition which merely characterizes the law in a way different than the targeted official would prefer is legally sufficient"; "the 'rebuttal statement is the proper forum in which the official may defend against the charges.' "[103]

### C. The Particularity Requirement

The particularity requirement is found in AS 15.45.500(2), which requires that a recall application include "the grounds for recall *described in particular* in not more than 200 words." (Emphasis added.) We concluded in *Meiners* that "[t]he purpose of the requirement of particularity is to give the officeholder a fair opportunity to defend his conduct in a rebuttal limited to 200 words."[104] The particularity requirement thus serves a function similar to the complaint in a civil case. The standard we apply in that context is "notice pleading," a "fairly lenient" standard[105] requiring only "(1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief the pleader seeks."[106] "We have not construed this rule to require details of evidence that a claimant will offer to establish a claim; to the contrary, we have emphasized that the rule is satisfied by a brief statement that 'give[s] the defendant fair notice of the claim and the grounds upon which it rests.' "[107]

---

[102]  *von Stauffenberg*, 903 P.2d at 1060.

[103]  *Id.* at 1060 n.13 (quoting *Meiners*, 687 P.2d at 301).

[104]  *Id.* at 1060 (quoting *Meiners*, 687 P.2d at 302).

[105]  *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 181 (Alaska 2009).

[106]  *Id.* (quoting Alaska R. Civ. P. 8(a)).

[107]  *Valdez Fisheries Dev. Ass'n v. Alyeska Pipeline Serv. Co.*, 45 P.3d 657, 673 (Alaska 2002) (alteration in original) (quoting *Sykes v. Melba Creek Mining, Inc.*, 952 P.2d 1164, 1168 n.4 (Alaska 1998)).

When applying the notice pleading standard to civil complaints, we construe them liberally to ensure access to the courts for everyone regardless of whether they have a lawyer's help.[108] We have expressed similar concerns about ensuring citizen access to the constitutional recall process, emphasizing in *Meiners* the importance of avoiding unnecessary "artificial technical hurdles" that can be overcome only with "the detailed advice of a lawyer"; we therefore "liberally constru[e] [the recall statutes] so that 'the people [are] permitted to vote and express their will.' "[109] This is in line with the legislature's own direction, in AS 15.45.550(1), that the application be "*substantially* in the required form" (emphasis added), and with the legislature's 200-word limit in AS 15.45.500(2), prioritizing concision over a thorough description of the petition's factual and legal basis.[110]

---

[108]     *See Sykes*, 952 P.2d at 1168 n.4.

[109]     *Meiners*, 687 P.2d at 296 (third alteration in original) (quoting *Boucher v. Engstrom*, 528 P.2d 456, 462 (Alaska 1974)). When *Meiners* was decided there was no word limit for the statement of grounds, only for the rebuttal statement. *See* former AS 29.29.150(a)(3) (1984) (requiring "a statement of the grounds of the recall stated with particularity as to specific instances" but containing no word limit). We note that the statement of grounds at issue in *Meiners* contained three substantive paragraphs, was over 450 words long, and was still challenged on particularity grounds. *Meiners*, 687 P.2d at 291-92, 302.

[110]     The word limit itself must be read in light of the substantial compliance test of AS 15.45.550(1). *Cf. Silver Bow Constr. v. State, Dep't of Admin., Div. of Gen. Servs.*, 330 P.3d 922, 923 (Alaska 2014) (discussing agency discretion to accept overlength bid in competitive bidding process). A word limit may be a significant burden on the exercise of the constitutional recall right, especially if the petition makes multiple allegations or arises from a complicated legal or factual background. The 200-word limit is not challenged on this appeal, but we note that statutory provisions governing the mechanics of elections, if challenged on constitutional grounds, "should be analyzed to determine whether they impermissibly burden the right to vote."

(continued...)

The State argues that the notice pleading standard is inappropriate because it does not ensure that the Division and the courts are able to review the statement for statutory compliance and because it does not ensure that voters will be able to understand the grounds for recall. The State argues that the statement of grounds must be "free-standing and comprehensive." According to the State, this does not mean the statement must include "every relevant fact," but it "must be clear enough to identify specifically what the official has done or not done so that the Division and courts can determine whether it meets the statutory criteria, the official can meaningfully respond in 200 words, and voters can understand the basis of the recall."

We certainly agree that the statement of grounds must be "clear enough" to serve its statutory purpose. The recall application should frame the issue such that the Division and the courts can determine its legal sufficiency, the targeted official has a fair opportunity to respond, and the voters can understand the basis for the recall effort. But in deciding whether these goals have been met, we must consider the 200-word limit,[111] the substantiality test,[112] and the need to construe statutory requirements in favor of preserving the exercise of constitutional rights.[113]

---

[110] (...continued)
*Sonneman v. State*, 969 P.2d 632, 637 (Alaska 1998) (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995)). "Severe" restrictions on the right to vote are subject to strict scrutiny and "must be 'narrowly drawn to advance a state interest of compelling importance.' " *Id.* at 638 (quoting *O'Callaghan v. State*, 914 P.2d 1250, 1254 (Alaska 1996)). On the other hand, "reasonable, nondiscriminatory restrictions" may be justified by the state's important regulatory interests. *Id.* at 638-39.

[111] AS 15.45.500(1).

[112] AS 15.45.550(1).

[113] *See Meiners*, 687 P.2d at 296.

The State also argues that to satisfy the particularity requirement the "statement of grounds must explain how the alleged conduct meets one or more grounds for recall." Recall Dunleavy's application alleged "Neglect of Duties, Incompetence, and/or Lack of Fitness, for the following actions," listing the four distinct allegations of objectionable conduct. Although the "and/or" construction "has been criticized in many legal opinions,"[114] it is commonly understood to mean "the one or the other or both."[115] The application thus leaves it to the individual voter to decide whether neglect of duties, incompetence, lack of fitness, or some combination of the three is demonstrated by each of the four allegations. And voters may reach different conclusions based on their individual assessments of the charges: for example, one voter may decide that a failure to appoint a judge as required by law demonstrates incompetence, another that it demonstrates two or three of the alleged grounds, and another that it demonstrates none of them. Alaska Statutes 15.45.500-.510 do not require that the petitioners map out all possible routes for voters' decision-making, and we will not read such a requirement into the statutes, especially given the substantiality test and the constraints of the 200-word limit. An allegation that lacks any logical connection to one of the statutory grounds for recall will be found legally insufficient. If a logical connection can be made, we leave it to the voters to decide whether to make it.

---

[114]    *Batchelor v. Madison Park Corp.*, 172 P.2d 268, 277-78 (Wash. 1946); *see And/or,* BRYAN A. GARNER, DICTIONARY OF LEGAL USAGE (3d ed. 2011) ("A legal and business expression dating from the mid-19th century, *and/or* has been vilified for most of its life — and rightly so.").

[115]    *Local Div. 589, Amalgamated Transit Union v. Massachusetts*, 666 F.2d 618, 627 (1st Cir. 1981); *see Batchelor*, 172 P.2d at 278 (opining that despite potential ambiguity of deed's use of "and/or," "[i]t seems perfectly clear that the lots were deeded for municipal park and playground purposes, or for either of those purposes"); GARNER, *supra* note 114 ("**And/or*, though undeniably clumsy, does have a specific meaning (*x *and / or y = x or y or both.*")).

### D. Defining The Grounds For Recall

The legislature established by statute the four potential grounds for recall — "(1) lack of fitness, (2) incompetence, (3) neglect of duties, or (4) corruption"[116] — but did not define them further. We observed in *Meiners* that the parties' dispute was due largely to ambiguities in the law and that "more carefully drawn statutes" could decrease the need for judicial involvement, explaining that "[t]he political nature of the recall makes the legislative process, rather than judicial statutory interpretation, the preferable means of striking the balances necessary to give effect to the Constitutional command that elected officers shall be subject to recall."[117] The legislature did not respond with any changes to the recall statutes,[118] but we must nonetheless attempt to discern its intent from the words it used, "with due regard for the meaning that the statutory language conveys to others."[119] "In the absence of a [statutory] definition, we construe statutory terms according to their common meaning[;] [d]ictionaries 'provide a useful starting point' for this exercise."[120] And although the

---

[116]    AS 15.45.510. The fourth ground, corruption, is not implicated in this case.

[117]    *Meiners*, 687 P.2d at 296.

[118]    We do not disagree with the dissent's exhortation that the legislature reconsider the statutory recall framework and allowable statutory grounds for recall.

[119]    *Cora G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 461 P.3d 1265, 1277 (Alaska 2020) (quoting *Heller v. State, Dep't of Revenue*, 314 P.3d 69, 74 (Alaska 2013)).

[120]    *Alaska Pub. Def. Agency v. Superior Court*, 450 P.3d 246, 253 (Alaska 2019) (alterations in original) (quoting *Alaska Ass'n of Naturopathic Physicians v. State, Dep't of Commerce*, 414 P.3d 630, 635 (Alaska 2018)); *see also* AS 01.10.040(a) ("Words and phrases shall be construed according to the rules of grammar and according to their common and approved usage."); *Wells v. State*, 102 P.3d 972, 975 (Alaska App.
(continued...)

definitions of the relevant statutory terms have not changed significantly over the past 70 years, we take into account the sources available to the constitution's framers and to the legislators who later enacted the statutes intended to further the framers' intent.[121]

### 1. Lack of fitness

"Fitness" is commonly defined as the condition of being "suitable" or "appropriate."[122] The superior court defined lack of fitness as "unsuitability for office demonstrated by specific facts related to the recall target's conduct in office." The court drew this definition from a 2004 recall case, *Valley Residents for a Citizen Legislature*

---

**120** (...continued)
2004) ("When the legislature uses a word or phrase but does not define it, a court should normally assume that the legislature intended the word or phrase to have its common, ordinary meaning.").

**121** *See, e.g., State v. Winkler*, 473 P.3d 796, 800 (Idaho 2020) ("[T]o discern the drafters' intent, we look to other sources close in time to the adoption of Idaho's constitution."); *In re Burnett Estate*, 834 N.W.2d 93, 98 (Mich. App. 2013) ("Words should be given their common and most obvious meaning, and consideration of dictionary definitions used at the time of passage for undefined terms can be appropriate."); *McKenna v. Williams*, 874 A.2d 217, 243 n.19 (R.I. 2005) (looking to "dictionary relevant to the time of the adoption of" state constitutional provision to determine contemporary understanding of word 'election' ").

**122** *Fit*, BLACK'S LAW DICTIONARY (4th ed. 1951) ("Suitable or appropriate. Conformable to a duty. Adapted to, designed, prepared." (citation omitted)); *Fit*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) ("Adjective: Proper; suitable; befitting; adapted to."); *Fitness, id.* ("The condition of being fit."); *Fit*, THE NEW CENTURY DICTIONARY (1946) ("Well adapted or suited by nature or character, as for a purpose, use, or occasion[;] . . . also, suitable by reason of qualifications, abilities, etc., as for a position, office, or function; qualified or competence."); *Fit*, THE AMERICAN HERITAGE DICTIONARY (2d ed. 1985) ("To be appropriate or suitable to."); *Fit*, WEBSTER'S NEW WORLD DICTIONARY (2d ed. 1980) ("1. [T]o be suitable or adapted to; be in accord with.").

*v. State, Division of Elections*,[123] in which the parties agreed on the appropriateness of the definition used by the superior court.

We agree that "unsuitability for office" is the proper definition, though we do not believe that the "specific facts" demonstrating unsuitability must be "related to the recall target's conduct in office." For example, personal misconduct such as domestic violence or tax fraud may be unrelated to the official's "conduct in office" and yet persuade a majority of voters that the official should be recalled. It is up to the voters to decide whether the official's conduct demonstrates an unfitness of the sort that is incompatible with the office he or she holds.

The State argues that "unsuitability for office" "is just as vague and amorphous as the phrase it purportedly defines," thus allowing "the kind of purely political, no-cause-required recall that the constitutional delegates expressly rejected." The State argues, therefore, that "fitness" should be limited to officials' physical and mental capacity to perform their official duties. But such a limited definition does not comport with the common meanings of "fit" and "fitness," which encompass appropriateness and suitability generally.[124] And defining fitness in a way that excludes moral fitness is inconsistent with the purposes of recall; the people's interest in removing a public official from office may be greatest when the official shows deficiencies of character.

---

[123] No. 3AN-04-06827 CI, Order Regarding Pending Motions (Alaska Super., Aug. 24, 2004) (finding that petition for recall of state senator, as amended by Division, was legally and factually sufficient); *see also Citizens for Ethical Gov't v. State, Div. of Elections*, No. 3AN-05-12133 CI, Transcript of Proceedings (Alaska Super., Jan. 4, 2006) (adopting definition of "lack of fitness" used in *Valley Residents* and finding that recall statement of grounds was factually and legally insufficient), *appeal dismissed as moot*, Supreme Court No. S-12208 (Alaska June 20, 2006).

[124] *See supra* note 122.

We conclude, in accordance with the words' common and ordinary meaning, that "lack of fitness" is appropriately defined as "unsuitability for office."

### 2. Incompetence

Various dictionaries define "incompetence" (or "incompetency") in similar terms: "Lack of ability, legal qualification, or fitness to discharge the required duty."[125] One law dictionary defines incompetency of a public officer more precisely as "the absence of a physical, moral, or intellectual quality, incapacitating one to perform the duties of his office, characterized by gross neglect of duty or gross carelessness in the performance of duty, lack of judgment, and want of sound discretion."[126]

Apparent from these definitions is the difficulty of defining the statutory terms without some overlap among them, such as when "incompetency" can mean "lack of fitness" or "neglect of duty." The State points to this difficulty as a reason why the grounds for recall should be narrowly defined. But although "[w]e assume that words added to a statute are not mere surplusage,"[127] we are also required to construe them

---

[125] *Incompetence*, BLACK'S LAW DICTIONARY (4th ed. 1951); *Incompetency*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) ("Inefficiency; a lack of some requisite ability. Inadequacy or insufficiency, either physical or mental . . . . Want of qualifications or eligibility." (citations omitted)); *Competence*, *competency*, THE NEW CENTURY DICTIONARY (1946) ("The quality of being competent; adequacy; due qualification or capacity."); *Competent*, *id.* ("Fitting, suitable, or sufficient for the purpose; adequate; properly qualified; having legal capacity or qualification."); *Incompetent*, *id.* ("Not competent; lacking qualification or ability; incapable; not legally qualified."); *Incompetent*, WEBSTER'S NEW WORLD DICTIONARY (2d ed. 1980) (adj.: "1. without adequate ability, knowledge, fitness, etc.; failing to meet requirements; incapable; unskillful").

[126] *Incompetency*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969).

[127] *Kodiak Island Borough v. Roe*, 63 P.3d 1009, 1014 n.16 (Alaska 2003).

"according to their common and approved usage,"[128] recognizing that common usage sometimes involves redundancy and imprecision. And the legislature may have intended some overlap in order to ensure broad coverage.[129] "As a result, 'there are instances in which a court may validly "prefer ordinary meaning to an unusual meaning that will avoid surplusage." ' Certainly, a court should not give a word an entirely fanciful meaning to avoid a minor redundancy."[130]

The superior court defined "incompetence" as "lack of [the] ability to perform the official's required duties," relying on the 1993 superior court decision in *Coghill v. Rollins*.[131] The State does not take issue with the definition directly, but it does take issue with the superior court's conclusion that the definition may cover an official's single mistake. The State argues that "people make mistakes all the time" but "[t]hat does not make them incompetent under any meaningful understanding of the word." The State proposes that for recall purposes incompetence must be alleged in one of two ways:

---

[128]    AS 01.10.040.

[129]    *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1126 (D.C. Cir. 2013) ("In some cases, redundancy may reflect the broad purpose of a congressional statute."); *Pawlowski v. Am. Family Mut. Ins. Co.*, 777 N.W.2d 67, 72 (Wis. 2009) ("The use of different words joined by the disjunctive connector 'or' normally broadens the coverage of the statute to reach distinct, although potentially overlapping sets.").

[130]    *Taylor v. Grubbs*, 930 F.3d 611, 624 (4th Cir. 2019) (quoting *Oak Grove Res., LLC v. Director, OWCP*, 920 F.3d 1283, 1291 (11th Cir. 2019) (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW § 26, at 176 (2012))).

[131]    No. 4FA-92-1728 CI, Memorandum Decision (Alaska Super., Sept. 14, 1993) (finding allegation of incompetence legally sufficient where statement of grounds asserted that lieutenant governor admitted his unfamiliarity with election laws he was charged with administering), *appeal dismissed as moot*, *Coghill v. Rollins*, Supreme Court No. S-6108 (Alaska Apr. 12, 1995).

"First, by an allegation that an official does not have basic knowledge or qualifications for the duties of the position," or second, by results — not just alleged mistakes but also an explanation "why . . . the official cannot perform the required duties."

Again, given the constitutional source of the recall right, we are wary of defining these statutory terms in ways that are not required by their common meaning. The more interpretive gloss we judicially place on the terms, the closer we come to the situation we warned of in *Meiners*: "wrapping the recall process in such a tight legal straitjacket that a legally sufficient recall petition could be prepared only by an attorney who is a specialist in election law matters."[132] In the absence of legislative specificity, we agree with the superior court's definition — "lack of ability to perform the official's required duties" — as reflecting the statutory terms' common meaning.

### 3. Neglect of duties

"Neglect of duty" is defined as "[t]he omission of one to perform a duty resting upon him" and "[t]he neglect or failure on the part of a public officer to do and perform a duty or duties laid on him as such by virtue of his office or required of him by law."[133] The superior court defined "neglect of duty" as "the nonperformance of a duty

---

[132] *Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 301 (Alaska 1984).

[133] *Neglect of duty*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969); *see also Neglect*, BLACK'S LAW DICTIONARY (4th ed. 1951) ("May mean to omit, fail, or forbear to do a thing that can be done, or that is required to be done, but it may also import an absence of care or attention in the doing or omission of a given act. And it may mean a designed refusal or unwillingness to perform one's duty." (citation omitted)); *Neglect*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) ("Verb: To omit to do or perform some work, act, or duty, required in one's business or occupation, or required as a legal obligation, such as that of making a payment. Noun: Omission to act or perform. The word does not generally imply carelessness or imprudence, but simply an omission to do or perform some work, duty or act."); *Neglect*, THE NEW CENTURY DICTIONARY (1946) ("[F]ail to carry out or perform."); *Neglect*, THE AMERICAN HERITAGE DICTIONARY (2d
(continued...)

of office established by applicable law." The court adopted this definition from *Valley Residents*, a case in which the parties agreed on the definition of the term.[134] In *Meiners* we discussed the analogous language from Title 29, holding that the relevant phrase from the local-official recall statutes — "failure to perform prescribed duties"[135] — included not just the specific duties imposed by statute on school board members but also "the duty to comply with statutes of general application relating to education."[136] We explained that if the board undertook to exercise a power it was not required to exercise, "it must do so in accordance with the law, even though it had no obligation to exercise that particular power at all."[137] And we held that the board's "exercise of the power in an unlawful manner could constitute a failure to perform a prescribed duty, one prescribed by the statute of general application."[138] The definition adopted by the

---

[133]    (...continued)
ed. 1985) (tr.v.: "1. To ignore or pay not attention to; disregard.  2. To fail to care for or give proper attention to. 3. To fail to do or carry out, as through carelessness or oversight.  n. 1. The act or an instance of neglecting something. 2. The state of being neglected. 3. Habitual lack of care."); *Neglect*, WEBSTER'S NEW WORLD DICTIONARY (2d ed. 1980) (verb: "1. to ignore or disregard . . . 2. to fail to care for or attend to sufficiently or properly; slight . . . 3. to fail to carry out (an expected or required action) through carelessness or by intention; leave undone;" noun: "1. the action of neglecting 2. lack of sufficient or proper care; negligence; disregard 3. the state of being neglected.").

[134]    *Valley Residents for a Citizen Legislature v. State, Div. of Elections*, No. 3AN-04-06827 CI, Order Regarding Pending Motions (Alaska Super., Aug. 24, 2004).

[135]    Former AS 29.28.140 (1984).

[136]    *Meiners*, 687 P.2d at 300.

[137]    *Id.*

[138]    *Id.*

superior court in this case is consistent with this explanation and with the common meaning of the words the legislature used.

The State again proposes that we define "neglect of duties" more narrowly than the superior court did, citing the need "to avoid de facto political recall and remain consistent with this Court's previous statements about recall in Alaska." The State proposes that we require "either an allegation of the significance of the duty or an allegation that the omission had a tangible consequence to justify subjecting the official to a recall election." Again, however, we default to the common meaning of the phrase in the absence of legislative direction. If the recall application alleges both the existence of a duty and the official's failure to perform it, we will leave it to the voters to decide whether the duty is significant and whether the failure to perform it matters.

**E.** **The Allegations In The Recall Committee's Statement Of Grounds Are Legally Sufficient And Satisfy The Particularity Requirement.**

We analyze in turn each of the four allegations in Recall Dunleavy's recall application.

> **1.** **Paragraph 1: "Governor Dunleavy violated Alaska law by refusing to appoint a judge to the Palmer Superior Court within 45 days of receiving nominations."**

The recall application's first paragraph alleges that the governor violated Alaska law by refusing to appoint a judge to a specific court location within the time prescribed by statute. The applicable law is AS 22.10.100, which provides, in pertinent part, that "[t]he governor shall fill a vacancy or appoint a successor to fill an impending vacancy in the office of superior court judge within 45 days after receiving nominations from the judicial council." The governor's statutory duty is mandatory;[139] the State does

---

[139] *See Petitioners for Incorporation of City & Borough of Yakutat v. Local Boundary Comm'n*, 900 P.2d 721, 724 (Alaska 1995) ("Unless the context otherwise
(continued...)

not argue otherwise. Accepting as true the factual allegation — that the governor did indeed "refus[e] to appoint a judge" within the time allowed — we conclude that this paragraph makes a legally sufficient showing of lack of fitness, incompetence, or neglect of duty.

Use of the word "refusal" suggests more than neglect; it suggests a knowledge of the law and intent to disregard it.[140] An allegation that an official has refused to follow the law therefore makes a prima facie showing of lack of fitness; this is especially true for the governor, who is constitutionally charged with "the faithful execution of the laws."[141]

As the superior court further analyzed this allegation, voters could believe that it showed the governor was "incompetent" because, while not intending to disregard the law, "he did not understand his duty to conduct his due diligence on the candidates or process before the expiration of the statutory deadlines." Alternatively, voters who could not or did not care to assess the governor's intent or level of understanding could

---

[139]    (...continued)
indicates, the use of the word 'shall' denotes a mandatory intent." (quoting *Fowler v. City of Anchorage*, 583 P.2d 817, 820 (Alaska 1978))).

[140]    *See, e.g.*, *In re Francis*, 604 B.R. 101, 106 (B.A.P. 1st Cir. 2019) (" 'Fail' is distinguishable from 'refuse' in that 'refuse' involves an act of the will, while 'fail' may be an act of inevitable necessity." (quoting *In re Tougas*, 354 B.R. 572, 578 (Bankr. D. Mass. 2006)); *In re Jordan*, 521 F.3d 430, 433 (4th Cir. 2008) (concluding that because "[t]he term used in [the bankruptcy code] is 'refused' not 'failed[,]' . . . the Court must find that the Debtors' lack of compliance with the relevant court order was willful and intentional" (quoting *Pierce v. Fuller (In re Fuller)*, 356 B.R. 493, 495 (Bankr. D.S.D. 2006))); *United States v. Wagner*, 292 F. Supp. 1, 3 (W.D. Wash. 1967) ("The word 'refuse' [in indictment for failure to register with draft board] contains within it an implication of guilty knowledge on the part of the actor."); *Osborne v. Int'l Ry. Co.*, 123 N.E. 849, 850 (N.Y. 1919) ("Refusal is active, while neglect is passive.").

[141]    *See* Alaska Const. art. III, § 16.

conclude that he simply " 'neglected his duty' because he failed to appoint a new judge within the time given by statute." We agree with the superior court that the paragraph makes a prima facie case of at least one of the statutory grounds for recall and is therefore legally sufficient.

The State does not argue that this ground fails the particularity requirement by failing to give the governor fair notice of the conduct at issue. The State does make three arguments against the paragraph's legal sufficiency, all of which we reject. First, the State argues that the paragraph does not make a prima facie case of incompetence because it fails to "allege that the governor did not understand his duty to appoint by the deadline; the court itself added this fact." But legal sufficiency does not require the explicit statement of every reasonable inference from the facts that *are* stated; if it did, the 200-word limit could never be satisfied and the citizens' right to initiate a recall would be an empty right.[142] As explained above, voters can determine that one or more of the statutory grounds for recall are satisfied even while making different, but reasonable, inferences about the governor's intent or level of understanding.

Second, the State faults the superior court's analysis for its overlapping definitions, by which "presumably all neglect of duty demonstrates a lack of fitness," "mak[ing] 'neglect of duty' completely redundant." But as explained above, applying the common meaning of these statutory terms does not require us to define them so precisely as to eliminate the possibility of overlap.

---

[142] The "notice pleading" standard of civil litigation again provides the appropriate analytical framework. When assessing the sufficiency of a complaint, we "presume all factual allegations of the complaint to be true *and* make all reasonable inferences in favor of the non-moving party." *DeRemer v. Turnbull*, 453 P.3d 193, 196 (Alaska 2019) (emphasis added) (quoting *Adkins v. Stansel*, 204 P.3d 1031, 1033 (Alaska 2009)).

Third, the State argues that "a harmless act with no lasting impact" — like the failure to appoint a judge within the time allowed by statute — should not be grounds for recall because if it is, the process is effectively "a no-cause political recall." More generally, the State argues that the Division and reviewing courts should act as gatekeepers to determine which allegations are serious enough to be presented to the voters. The State argues that "a governor's failure to issue a proclamation to commemorate Women Veterans Day," for example, in violation of a statutory mandate,[143] would be inconsequential and should never satisfy a for-cause recall process like Alaska's.

But it is for the voters — not the Division or the courts — to judge the seriousness of an alleged ground.[144] The people asked to sign petitions must decide whether the allegations are serious enough to warrant a recall election; each voter in the voting booth must decide whether the allegations are serious enough to warrant removal from office. We are not naive to the reality that some voters will vote for or against recall motivated by policy differences or political loyalties totally divorced from the grounds alleged in the recall petition. This will be the case regardless of how the legislature states the grounds for recall and how those grounds are defined. But we cannot police the motivations of recall committees, petition signers, or voters; our task is to determine whether the recall application's allegations are legally sufficient and are particular enough to give the targeted official fair notice of the claim. The first paragraph of Recall Dunleavy's petition satisfies these requirements.

---

[143]    AS 44.12.078.

[144]    *See Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 301 (Alaska 1984) ("Again, it is the responsibility of the voters to make their decision in light of the charges and rebuttals. It is not the role of the [elections officials] to take the matter out of the voters' hands.").

**2. Paragraph 2: "Governor Dunleavy violated Alaska Law and the Constitution[] and misused state funds by unlawfully and without proper disclosure[] authorizing and allowing the use of state funds for partisan purposes to purchase electronic advertisements and direct mailers making partisan statements about political opponents and supporters."**

The second paragraph alleges that the governor violated Alaska law and the Alaska Constitution by misusing state funds for partisan purposes. We accept as true the allegation that the governor used state funds without proper disclosure and "authoriz[ed] and allow[ed] the use of state funds for partisan purposes to purchase electronic advertisements and direct mailers making partisan statements about political opponents and supporters." State law does require that state funds be used for public purposes, and it does require certain disclosures regarding expenditures that are partisan or campaign-related.[145] The paragraph thus alleges unlawful conduct that would in fact be unlawful. Accepting the factual allegations as true, as we must,[146] we conclude that the paragraph makes a prima facie showing of at least one statutorily prescribed ground for recall.

---

[145] Recall Dunleavy cited some of these laws in its statement of grounds, though without identifying which law pertained to which ground: Alaska Const. art. IX, § 6 ("No tax shall be levied, or appropriation of public money made, or public property transferred, nor shall the public credit be used, except for a public purpose."); AS 39.52 (Executive Branch Ethics Act); "AS 15.13, including .050, .090, .135, and .145" (addressing registration of persons or groups intending to make political expenditures, requiring certain disclosures, and prohibiting expenditure of public funds to influence election outcomes); Legislative Council (31-L51006) (memo from Daniel C. Wayne, Legislative Counsel, to Representative Zack Fields (May 20, 2019) with subject line "Executive Branch Ethics Act restrictions on use of funds for partisan political purposes (Work Order No. 31-LS1006)").

[146] *Meiners*, 687 P.2d at 300 n.18 ("We emphasize that it is not our role, but rather that of the voters, to assess the truth or falsity of the allegations in the petition.").

Again, if voters accept the factual premise, they may draw their own inferences from the conduct alleged. They may conclude that the governor knew his conduct was illegal and intentionally violated the laws about use of public funds and proper disclosures — a prima facie showing of lack of fitness — or that the governor did not know he was violating these laws — a prima facie showing of incompetence. The paragraph also alleges misuse of funds; because the governor has the duty to use funds only for lawful purposes,[147] the allegation may be read as alleging a neglect of duties. We conclude that the allegation is legally sufficient.

The State argues that the allegation "lacks the necessary factual particularity to support a recall." It argues that "[w]ithout any information about either the statements or the individuals, neither the voters nor the Division nor this Court" can determine whether any laws were broken. But this argument fails for two reasons. First, the factual allegations in this paragraph, which we assume to be true, establish a prima facie violation of law. Use of state funds "for partisan purposes," if true, violates the Ethics Act.[148] And the use of state funds to influence the outcome of the election of a candidate to a state or municipal office, if true, violates Alaska's campaign finance law.[149] Assuming the facts are true, there is no need for additional information to establish a ground for recall.

---

[147]    *See* Alaska Const. art. IX, § 6 ("No tax shall be levied, or appropriation of public money made . . . except for a public purpose.").

[148]    AS 39.52.120(b)(6) ("A public officer may not use or authorize the use of state funds, facilities, equipment, services, or another government asset or resource for partisan political purposes.").

[149]    AS 15.13.145.

Second, under the notice pleading standard, an allegation need not contain all the facts necessary to determine whether a law has been broken, nor would this always be feasible within the 200-word limit. We conclude that this allegation puts the governor on notice of the claim and gives him a fair opportunity to respond, which is all the law requires.[150]

### 3. Paragraph 3: "Governor Dunleavy violated separation-of-powers by improperly using the line-item veto to attack the judiciary and the rule of law."

The third paragraph, as edited by the superior court to eliminate the final clause,[151] alleges that the governor violated the separation of powers doctrine "by improperly using the line-item veto to attack the judiciary and the rule of law." In its opening brief the State contested only the paragraph's factual sufficiency. After oral argument we asked for supplemental briefing on the paragraph's legal sufficiency as well.[152]

Accepting as true the paragraph's allegation of motive — that the governor used the veto "improperly" and "to attack the judiciary and the rule of law" — we conclude that the paragraph is legally sufficient and satisfies the particularity requirement. To explain our conclusion we first set out the constitutional background of the principles at issue.

---

[150] *See Meiners*, 687 P.2d at 300.

[151] As noted above, the superior court found legally insufficient the allegation that the governor violated separation of powers by using his veto power "to preclude the legislature from upholding its constitutional Health, Education and Welfare responsibilities."

[152] *State, Div. of Elections v. Recall Dunleavy*, No. S-17706 (Alaska Supreme Court Order, Apr. 2, 2020).

### a.     The line-item veto generally

The governor has the constitutional authority to veto bills passed by the legislature and may also, "by veto, strike or reduce items in appropriation bills."[153]  The line-item veto (or "item veto") has several purposes:  (1) to prevent "logrolling," a practice by which the legislature "deliberately insert[s] in one bill several dissimilar or incongruous subjects in order to secure the necessary support for passage of the measure";[154] and (2) to give "governors some ability to limit state expenditures."[155]  "Alaska's constitutional convention delegates intended to 'create a strong executive branch with "a strong control on the purse strings" of the state.' "[156]  Accordingly, the

---

[153]     Alaska Const. art. II, § 15 ("The governor may veto bills passed by the legislature.  He may, by veto, strike or reduce items in appropriation bills.  He shall return any vetoed bill, with a statement of his objections, to the house of origin.").

[154]     *Meyer v. Alaskans for Better Elections*, 465 P.3d 477, 482 (Alaska 2020) (quoting *Gellert v. State*, 522 P.2d 1120, 1122 (Alaska 1974)).

[155]     *Alaska Legislative Council v. Knowles* (*Knowles I*), 21 P.3d 367, 373 (Alaska 2001); *see* Richard Briffault, *The Item Veto in State Courts*, 66 TEMP. L. REV. 1171, 1177 (1993) ("The item veto represents the coming together of three widespread state constitutional policies:  the rejection of legislative logrolling; the imposition of fiscal restrictions on the legislature; and the strengthening of the governor's role in budgetary matters."); *see also generally* Nicholas Passarello, *The Item Veto and the Threat of Appropriations Bundling in Alaska*, 30 ALASKA L. REV. 125, 129-36 (2013) (examining the line-item veto generally and its use in Alaska).

[156]     *Knowles I*, 21 P.3d at 372 (quoting *Thomas v. Rosen*, 569 P.2d 793, 795 (Alaska 1977) (quoting 3 PACC 1740 (Jan. 11, 1956))); *see also Alaska Legislative Council ex rel. Alaska State Legislature v. Knowles* (*Knowles II*), 86 P.3d 891, 895 (Alaska 2004) (holding governor's veto power applies only to monetary appropriations).  However, as we observed in *Knowles I*, "this control gives the governor no appropriation power.  The item veto permits the governor only to tighten or close the state's purse strings, not to loosen them or to divert funds for a use the legislature did not approve." 21 P.3d at 372.

line-item veto found in the Alaska Constitution is an especially strong one.  Alaska's governor, unlike most, may use the veto not just to eliminate individual items in appropriations bills but also to reduce the amount appropriated.[157]  And the legislature can override a veto only by a three-quarters majority vote.[158]

### b. The governor's line-item veto power is limited by other constitutional provisions.

The governor has broad discretion to exercise the veto power; vetoes are political and legislative acts,[159] and it is the role of the judiciary to judge their legality, not their wisdom.  "When an act is committed to executive discretion, the exercise of that discretion *within constitutional bounds* is not subject to the control or review of the courts.  To interfere with that discretion would be a violation of the doctrine of separation of powers."[160]  If a veto is "within constitutional bounds"[161] and is accompanied by a veto message that satisfies the "minimum of coherence standard,"[162]

---

[157]    Eleven other states provide for the reduction power.  *See Gubernatorial Veto Authority with Respect to Major Budget Bill(s)*, NAT'L CONF. ST. LEGISLATURES, at Table 6-3 (Dec. 2008), https://www.ncsl.org/research/fiscal-policy/gubernatorial-veto-authority-with-respect-to-major.aspx.

[158]    Alaska Const. art. II, § 16.

[159]    *See Knowles I*, 21 P.3d at 375-76; *see also Arnett v. Meredith*, 121 S.W.2d 36, 38 (Ky. 1938) ("[T]he exercise of the right of veto, wherever it is conferred by the local Constitution, involves the performance of legislative functions instead of executive functions.").

[160]    *Pub. Def. Agency v. Superior Court, Third Judicial Dist.*, 534 P.2d 947, 950 (Alaska 1975) (emphasis added).

[161]    *Id.*

[162]    *See Knowles I*, 21 P.3d at 376.  An express constitutional condition on the veto power is that the governor provide "a statement of his objections" to the item or

(continued...)

courts will not interfere. Checking the wisdom of the governor's lawful veto is up to the legislature through the exercise of its power to override.[163]

But as with all discretionary governmental actions, the exercise of the governor's veto power must be "within constitutional bounds."[164] We held in *von Stauffenberg* that "elected officials cannot be recalled for *legally* exercising the discretion granted to them by law."[165] Although we cited a Washington case, *Chandler v. Otto*, for this proposition, the court in *Chandler* said it slightly differently: "Legally sufficient means that an elected official cannot be recalled for *appropriately* exercising the discretion granted him or her by law."[166] The Washington Supreme Court elaborated on this rule in *In re Shipman*, holding that "[i]f a discretionary act is involved [in a recall petition], the petitioner must show that the official exercised discretion in a manifestly unreasonable manner."[167] And the New Mexico Supreme Court held in *CAPS v. Board*

---

[162]     (...continued)
amount vetoed. Alaska Const. art. II, § 15. The purpose of the veto message is two-fold: "It allows the legislature to determine what it must do to avoid incurring another veto. And it forces the governor to reveal his or her reasoning, 'so that both the Legislature and the people might know whether or not he was motivated by conscientious convictions in recording his disapproval.'" *Knowles I*, 21 P.3d at 375-76 (quoting *Arnett*, 121 S.W.2d at 40).

[163]     Alaska Const., art. II, § 16.

[164]     *See Pub. Def. Agency*, 534 P.2d at 950.

[165]     *von Stauffenberg v. Comm. for Honest & Ethical Sch. Bd.*, 903 P.2d 1055, 1060 (Alaska 1995) (emphasis added) (citing *Chandler v. Otto*, 693 P.2d 71, 74 (Wash. 1984)).

[166]     *Chandler*, 693 P.2d at 74 (emphasis added).

[167]     886 P.2d 1127, 1131 (Wash. 1995); *see also Teaford v. Howard*, 707 P.2d 1327, 1332 (Wash. 1985) ("[O]fficials cannot be recalled for making a discretionary (continued...)

*Members* that a recall petition alleging misfeasance[168] requires a showing that the public official exercised discretion "with an improper or corrupt motive."[169] The conclusion in these cases is the same whether the standard is "legal" exercise of discretion,[170] "appropriate" exercise of discretion,[171] or discretionary acts that are not "unreasonable"[172] or done with "improper or corrupt motive"[173]: simply because an act is committed to an official's discretion does not mean that citizens may not properly cite it as a reason for recall.

### c. The governor's veto power is bounded by the separation of powers doctrine.

The Alaska Constitution "vest[s] 'legislative power in the legislature; executive power in the governor; and judicial power' in the courts."[174] Derived from this "distribution of power among the three branches of government" is the separation of powers doctrine, which "limits the authority of each branch to interfere in the powers that

---

[167] (...continued) decision unless they act arbitrarily or unreasonably.").

[168] Misfeasance is "a lawful act performed in a wrongful manner." *Misfeasance*, BLACK'S LAW DICTIONARY (11th ed. 2019).

[169] 832 P.2d 790, 792 (N.M. 1992).

[170] *See von Stauffenberg*, 903 P.2d at 1060.

[171] *See Chandler*, 693 P.2d at 74.

[172] *See Teaford*, 707 P.2d at 1332.

[173] *See CAPS*, 832 P.2d at 792.

[174] *Jones v. State, Dep't of Revenue*, 441 P.3d 966, 981 (Alaska 2019) (quoting *Alaska Pub. Interest Research Grp. v. State*, 167 P.3d 27, 35 (Alaska 2007)).

have been delegated to the other branches."[175] Although not specifically named in the Constitution, "the separation of powers and its complementary doctrine of checks and balances are part of the constitutional framework of this state."[176]

Other states' courts have held that another branch's blocking of court system funding violates the separation of powers doctrine if it results in underfunding the judicial branch to such an extent that the courts cannot continue to meet their constitutional mandates.[177] The State agrees that a funding failure of this magnitude would be unconstitutional.

But the separation of powers doctrine does more than protect each branch's functional existence. We have described the doctrine's purposes as "to preclude the exercise of arbitrary power and to safeguard the independence of each branch of

---

[175]     *Alaska Pub. Interest Research Grp.*, 167 P.3d at 35.

[176]     *Id.* at 34-35; *see also Pub. Def. Agency v. Superior Court, Third Judicial Dist.*, 534 P.2d 947, 950 (Alaska 1975) ("[I]t can fairly be implied [from the Constitution's separate articles] that this state does recognize the separation of powers doctrine.").

[177]     *See County of Barnstable v. Commonwealth*, 572 N.E.2d 548, 550 (Mass. 1991) ("The constitutional establishment of a tripartite form of government carries with it an implied assumption that sufficient funds will be provided to operate all three branches."); *In re Fiscal Year 2010 Judicial Branch Appropriations*, 27 So. 3d 394, 395 (Miss. 2010) ("As part of the separation of powers among, and checks and balances on, these three co-equal branches of government, our Legislature has the duty to fund the judicial branch of government."); *State ex rel. Durkin v. City Council of Youngstown*, 459 N.E.2d 213, 216 (Ohio 1984) ("The doctrine of separation of powers requires that the funds necessary for the administration of justice be provided to the courts."); *State ex rel. Metro. Pub. Def. Servs., Inc. v. Courtney*, 64 P.3d 1138, 1141 (Or. 2003) ("[W]ith respect to the judiciary, the separation of powers principle is not offended by choices that the other branches make, unless those choices unduly burden the capacity of the judiciary to perform its core function.").

government."[178] One branch's threat to the independence of another — well short of its elimination by underfunding — may therefore violate separation of powers. For example, in *Public Defender Agency v. Superior Court, Third Judicial District*, we reviewed a superior court's order that the attorney general's office prosecute someone for contempt of a child support order; we decided that the order violated the separation of powers doctrine because it overstepped "the line which divides [the judicial] branch of government from that of the executive" by "infring[ing] upon the discretionary powers residing in the executive branch."[179] In *Bradner v. Hammond* we reviewed a law requiring legislative confirmation of "subcabinet officials, including deputy commissioners and division heads of the executive branch"; we affirmed a superior court order striking down the law as violating separation of powers because it infringed on the governor's authority to appoint executive officials without legislative confirmation except as constitutionally required.[180] And in *Alaska Public Interest Research Group v. State* we considered whether the legislature's creation of the Alaska Workers' Compensation Appeals Commission as an executive agency violated separation of powers by "tak[ing] judicial power from the judicial branch and delegat[ing] that power to the executive."[181] We concluded that it did not because the Constitution authorized

---

[178] *Alaska Pub. Interest Research Grp.*, 167 P.3d at 35; *see also Bradner v. Hammond*, 553 P.2d 1, 5 (Alaska 1976) (describing separation of powers doctrine's underlying rationale as "the avoidance of tyrannical aggrandizement of power by a single branch of government").

[179] 534 P.2d at 950-51.

[180] 553 P.2d at 1-2, 7-8 ("In our view, the separation of powers doctrine requires that the blending of governmental powers will not be inferred in the absence of an express constitutional provision.").

[181] 167 P.3d at 34-35.

the creation of such quasi-judicial agencies, the Commission's jurisdiction was limited to workers' compensation cases, and its decisions remained subject to judicial review.[182]

We have not previously had to consider a disputed veto targeting the judicial branch, but other courts have. Some courts deem unconstitutional any executive or legislative interference in the judiciary's own assessment of its budgetary needs.[183] In *Jorgensen v. Blagojevich* the Illinois Supreme Court held that the governor's use of the line-item veto to reduce a cost of living adjustment for state judges violated separation of powers.[184] The Illinois Supreme Court described the threat this posed to judicial independence:

> As arbiters of the law and guardians of individual liberties, members of the judiciary often find themselves at odds with these other branches of government. In fulfilling their duties, judges must frequently challenge the actions of the very governmental bodies who provide the financial and other resources they need to operate. Such challenges are unavoidable. They are an inherent part of the adjudicatory

---

[182] *Id.* at 35-37.

[183] *See In re Fiscal Year 2010 Judicial Branch Appropriation*, 27 So. 3d 394, 395 (Miss. 2010) (holding that statute authorizing State Fiscal Officer to cut appropriations could not constitutionally be applied to judicial branch); *State ex rel. Brotherton v. Blankenship*, 207 S.E.2d 421, 431 (W.Va. 1973) (citing "maxim that the judiciary department possesses the inherent power to determine its needs and to obtain the funds necessary to fulfill such needs" and holding that governor lacked constitutional authority to disapprove or reduce specific items in judiciary's budget); *see also State ex rel. Durkin v. City Council of Youngstown*, 459 N.E.2d 213, 216 (Ohio 1984) (citing "well-established principle that the administration of justice by the judicial branch of the government cannot be impeded by the other branches of the government in the exercise of their respective powers" and holding that city council was required to fully fund court clerk's salary as required by statute (quoting *State ex rel. Foster v. Bd. of Cty. Comm'rs*, 242 N.E.2d 884, 886 (Ohio 1968))).

[184] 811 N.E.2d 652, 656 (Ill. 2004).

process. That their constitutional duty requires this of judges does not mean their decisions will be well received by the other branches of government. Retribution against the courts for unpopular decisions is an ongoing threat.[185]

The governor's primary argument in *Jorgensen* was that his veto was unreviewable because its use was committed to his discretion by the constitution.[186] The Illinois Supreme Court held, however, that this position was "incompatible with the principles of separation of powers and checks and balances that are the foundation for our tripartite system of government."[187]

A federal district court had similar concerns in a case involving the federal Line Item Veto Act, holding the Act unconstitutional in part because it violated the separation of powers doctrine.[188] Although the court based its separation of powers decision on the "transfer [of] non-delegable legislative authority to the Executive Branch,"[189] it cautioned in a footnote that "the Line Item Veto could also affect judicial

---

[185]  *Id.* at 660-61.

[186]  *Id.* at 666.

[187]  *Id.*

[188]  *City of New York v. Clinton*, 985 F. Supp. 168, 181-82 (D.D.C. 1998). The Line Item Veto Act was later struck down by the Supreme Court as violating the Presentment Clause, which requires that legislation be passed by both houses of Congress before the President may sign it into law. *See* U.S. Const. art. I, § 7, cl. 2; *Clinton v. City of New York*, 524 U.S. 417, 436-49 (1998). The Supreme Court in *Clinton* held that the Line Item Veto Act effectively "authorize[d] the President to create a different law" than that passed by Congress, circumventing the procedures required by the Presentment Clause. 524 U.S. at 448. The Alaska Constitution has similar procedural requirements, but it expressly authorizes the line-item veto. *See* Alaska Const. art. II, § 15.

[189]  *Clinton*, 985 F. Supp. at 181.

independence," explaining: "It is possible that the President might use the Line Item Veto to manipulate the judiciary's budget, thus exerting pressure on its members."[190] Similar concerns are evident in the United States Supreme Court's explanation of the purposes of the U.S. Constitution's Compensation Clause,[191] which prevents the diminishment of judges' salaries during their terms of office: "A Judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government."[192]

Courts can usually stay out of veto disputes between the legislative and the executive branches without risk to the constitution's distribution of powers;[193] the powers of the legislative and executive branches are close to equipoise, and those two branches

---

[190]    *Id.* at 179 n.14.  The court cited a law review article that focused on the question "Could an executive use the line item veto to punish, reward, or otherwise influence the judiciary?," concluding that the risk to judicial independence was significant.  *Id.* (citing Robert Destro, *Whom Do You Trust?  Judicial Independence, the Power of the Purse & the Line Item Veto*, FED. LAW., 26, 29 (1997).

[191]    *See* U.S. Const. art. III, § 1 ("The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office.").  The Alaska Constitution has a parallel provision.  *See* Alaska Const. art. IV, § 13 ("Compensation of justices and judges shall not be diminished during their terms of office, unless by general law applying to all salaried officers of the State.").

[192]    *United States v. Will*, 449 U.S. 200, 217-18 (1980).

[193]    *See Knowles I*, 21 P.3d 367, 376 (Alaska 2001) (observing that disputes involving validity of governor's reasons for veto "are inherently political" and "[t]he judiciary has no special competence" to settle them).

can negotiate political issues from positions of roughly equal strength.[194] But the judiciary does not negotiate its decisions with the other branches, even though it is, by some measures, the weakest branch of government[195] and is often called upon to declare the legality of the other branches' actions.[196] The State, through the executive branch, appears before the courts as a litigant more than does any other single entity. An implication that the State can pressure a court to rule in its favor because of budgetary concerns sends a discouraging message to other litigants — especially those litigating

---

[194] *See Simpson v. Murkowski*, 129 P.3d 435, 447 (Alaska 2006) ("[U]nder the Alaska Constitution 'it is the joint responsibility of the governor and the legislature to determine the State's spending priorities . . . .' "); *Ninetieth Minn. State Senate v. Dayton*, 903 N.W.2d 609, 624 (Minn. 2017) ("[O]ur constitution does not require that the Judicial Branch referee political disputes between our co-equal branches of government over appropriations and statewide policy decisions when those branches have both an obligation and an opportunity to resolve those disputes between themselves.").

[195] *See, e.g.*, THE FEDERALIST NO. 78 (Alexander Hamilton) ("[T]he judiciary is beyond comparison the weakest of the three departments of power; . . . [it] can never attack with success either of the other two; and . . . all possible care is requisite to enable it to defend itself against their attacks."); *Jorgensen v. Blagojevich*, 811 N.E.2d 652, 660-62 (Ill. 2004).

[196] *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."); *Wielechowski v. State*, 403 P.3d 1141, 1142-43 (Alaska 2017) ("[O]f the three branches of our state government, we are entrusted with the 'constitutionally mandated duty to ensure compliance with the provisions of the Alaska Constitution.' " (quoting *Malone v. Meekins*, 650 P.2d 351, 356 (Alaska 1982))); *see also Gamble v. United States*, 139 S. Ct. 1960, 1985 n.5 (2019) (Thomas, J., concurring) (noting that "[i]n the context of a judicial case or controversy," other branches' determinations about the constitutionality of their actions "do not bind the Judiciary in performing its constitutionally assigned role," and that "consistent with the nature of the 'judicial Power,' the federal courts' judgments bind all parties to [a] case, including Government officials and agencies").

against the State — who look to the courts for impartial justice and in most cases lack any countervailing influence.[197]

In short, the separation of powers doctrine is intended in part to ensure that the judiciary is not pressured to decide cases with one eye on its budget. We conclude that the doctrine may be violated by a governor's use of the veto power with the intent of pressuring the courts to rule in a particular way.

### d. Analyzing the sufficiency of the allegation

Taken as true, Recall Dunleavy's allegation that the governor violated the separation of powers doctrine "by improperly using the line-item veto to attack the judiciary and the rule of law" is legally sufficient. As explained above, the veto power, though discretionary, may be exercised only within constitutional limits. Separation of powers is a fundamental part of our constitutional structure, and the doctrine may be violated by a governor's "improper" use of a veto "to attack the judiciary." The paragraph thus makes a prima facie showing of lack of fitness; voters could conclude that violating separation of powers by an improper use of the veto demonstrates disregard for

---

[197] Similar concerns were voiced during hearings on the Line Item Veto Act, when the Chief Judge of the Sixth Circuit Court of Appeals testified on behalf of the U.S. Judicial Conference that "[t]he last thing needed is a new mechanism to give the executive branch control of the Judiciary's budget, particularly in light of the fact that the United States, almost always through the executive branch, has more lawsuits in the Federal courts than any other litigant." *Joint Hearing Before the H. Comm. on Gov't Reform and Oversight & the S. Comm. on Governmental Affairs*, 104th Cong. 88 (statement of Hon. Gilbert S. Merritt, Chairman, Exec. Comm. Judicial Conference of the United States); *see also* Louis Fisher, *Judicial Independence and the Line Item Veto*, 36 JUDGES' J. 18, 52-53 (1997) (citing Letter from Leonidas Ralph Mecham, Sec'y, Judicial Conference of the United States, to Senators Ted Stevens and Pete V. Domenici (Mar. 15, 1996)).

the Constitution the governor is entrusted to uphold.[198] The paragraph makes a prima facie showing of incompetence; voters could conclude that a governor who is unaware of the limits and constitutional importance of the separation of powers doctrine demonstrates a lack of ability to perform required duties.[199]

The superior court held that "neglect of dut[y]" could also be shown by the allegation that "Governor Dunleavy breached his oath of office to defend the Constitution by attempting to infringe upon the powers reserved to the Judicial branch." We agree with the superior court that this made a prima facie showing of "the nonperformance of a duty of office established by applicable law."

The State argues that the separation of powers allegation does not satisfy the particularity requirement because it "fails to inform anyone unfamiliar with the issue of what the governor did." We agree that this is the leanest of the four allegations; it does not tell the whole story, nor could it within the statutory 200-word limit. But the ultimate test is of "notice" and whether the governor has "a fair opportunity to defend his conduct in a rebuttal limited to 200 words."[200] The State does not argue that the governor cannot understand the factual basis for the allegation. The paragraph alleges the act — use of the line-item veto — and asserts its illegality by reference to the separation of powers doctrine and an "improper" motive. Both the committee and the governor

---

[198]    *See* Alaska Const. art. XII, § 5 (requiring public officers to swear to "support and defend . . . the Constitution of the State of Alaska").

[199]    An analogous case is *Coghill v. Rollins*, in which the superior court found legally sufficient the allegation that the lieutenant governor lacked familiarity with the election laws he was charged to administer. *Coghill v. Rollins*, No. 4FA-92-1728 CI, Memorandum Decision (Alaska Super., Sept. 14, 1993), *appeal dismissed as moot*, *Coghill v. Rollins*, Supreme Court No. S-6108 (Alaska Supreme Court Order, Apr. 12, 1995).

[200]    *Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 302 (Alaska 1984).

have the same opportunity to explain the allegation's factual background and why it does or does not support recall. It is then "the responsibility of the voters to make their decision in light of the charges and rebuttals."[201] Again considering the statutory substantiality test[202] and the liberality with which we are required to review citizens' exercise of this constitutional right,[203] we conclude that the allegation satisfies the particularity requirement.[204]

    **4.**    **Paragraph 4: "Governor Dunleavy acted incompetently when he mistakenly vetoed approximately $18 million more than he told the legislature in official communications he intended to strike. Uncorrected, the error would cause the state to lose over $40 million in additional federal Medicaid funds."**

The fourth paragraph of the recall application again involves the governor's discretionary power to apply the line-item veto to appropriations bills and to decrease

---

[201]    *Id.* at 301.

[202]    AS 15.45.550(1).

[203]    *Meiners*, 687 P.2d at 296.

[204]    The dissent contends that vetoing "such a small portion" of the court system's budget could not violate the separation of powers. It also contends that this court has not concluded that it could. But we conclude that vetoing this non-de minimis amount of the total budget, if done for improper purposes as the recall application alleged, could violate separation of powers. The dissent also contends that this court has not concluded that "the governor illegally used the line-item veto to attack the judiciary and the rule of law." It is for the voters, not this court, to decide the truth of the allegations that the governor's veto was for an improper purpose, such as for retribution or with an intent to pressure the courts to rule a particular way. Our role is limited to deciding whether the allegations, if true, could justify recall as the constitution permits for lack of fitness or incompetence or neglect of duty. We conclude that they do.

legislative appropriations.[205]  It alleges that the governor made a mistaken veto that, if uncorrected, would have "cause[d] the state to lose over $40 million in additional federal Medicaid funds."  The State does not contest that the paragraph is alleged with sufficient factual particularity; the governor has a fair opportunity to respond.

We conclude that the allegation is also legally sufficient.  While the governor's "legal" or "proper" exercise of discretion cannot establish a for-cause ground for recall,[206] as discussed above, the specific allegation here is that the governor was not making a conscious decision but rather "acted incompetently" and made a mistake, later corrected.  " 'Discretionary acts' are those requiring 'personal deliberation, decision and judgment.' "[207]  A mistake by definition is not a deliberate decision or judgment; it is not an exercise of discretion.[208]

The consequences of a mistaken veto may be serious and hard to correct.[209]

---

[205]     Alaska Const. art. II, § 15.

[206]     *See von Stauffenberg v. Comm. for Honest & Ethical Sch. Bd.*, 903 P.2d 1055, 1060 (Alaska 1995).

[207]     *State v. Haley*, 687 P.2d 305, 316 (Alaska 1984) (quoting W. PROSSER, HANDBOOK OF THE LAW OF TORTS § 132, at 988 (4th ed. 1971)); *see Discretion*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("1. Wise conduct and management exercised without constraint; the ability coupled with the tendency to act with prudence and propriety. 2. Freedom in the exercise of judgment; the power of free decision-making.").

[208]     *See Tanenbaum v. D'Ascenzo*, 51 A.2d 757, 758 (Pa. 1947) (holding that mandamus, which typically is not available for setting aside discretionary acts of public officials, nonetheless is appropriate when "by a mistaken view of the law or an arbitrary exercise of authority there has been in fact no actual exercise of discretion.").

[209]     As noted above, the Alaska constitution requires a three-quarters majority vote in the legislature to override a veto of an appropriation bill.  Alaska Const. art. II,

(continued...)

Some voters could decide that even a single mistake of sufficient magnitude demonstrates unfitness or incompetence. We therefore conclude that this allegation makes a prima facie showing of at least one of the statutorily prescribed grounds for recall and is both legally and factually sufficient.[210]

## VI. CONCLUSION

For these reasons, we AFFIRM the superior court's order granting summary judgment to Recall Dunleavy.

---

[209] (...continued)
§ 16.

[210] Although this paragraph specifically alleges that the governor acted "incompetently," Recall Dunleavy argues that it encompasses all three grounds for recall alleged in the application's introductory phrase. We conclude only that the allegation satisfies at least one of the statutorily prescribed grounds for recall; we leave it to the voters to decide whether it satisfies more than one.

STOWERS, Justice, dissenting in part.

I dissent from the court's holdings that Recall Dunleavy's two allegations concerning Governor Dunleavy's exercise of his constitutional authority to veto certain appropriations by the legislature are legally sufficient. In my opinion, neither allegation is legally sufficient.

Article II, section 15 of the Alaska Constitution provides: "The governor may veto bills passed by the legislature. He may, by veto, strike or reduce items in appropriation bills. He shall return any vetoed bill, with a statement of his objections, to the house of origin." This express constitutional grant of authority and discretion is not otherwise limited or qualified in our constitution.[1] And the court fails to cite any history from the constitutional convention where delegates expressed any intention to limit the governor's strong veto authority. To the contrary, as the court notes above, when the delegates to the Alaska constitutional convention deliberated and drafted the constitution — and when Alaskans voted to adopt their work — they decided that the State of Alaska was to be led by an executive embued with an especially strong veto power, including the power to reduce amounts appropriated.[2] That is what Governor Dunleavy did in this case.

Notwithstanding the notable absence of textual limiting language in our constitution and without identifying any constitutional convention history supporting limitation, the court today creates new limitations on the governor's explicit constitutional veto authority. The court says the governor's line-item veto is limited by

---

[1]     Of course, the constitution authorizes the legislature to override a veto by a two-thirds majority vote or, for revenue or appropriations bills, a three-quarters majority vote. Alaska Const. art. II, § 16.

[2]     Opinion at 39-40.

other "constitutional bounds" like the separation of powers doctrine.[3]  But the separation of powers doctrine, whatever its contours in other contexts, is not applicable to the governor's line-item vetoes in this case.

First, the Alaska Constitution does not specifically express or recognize a separation of powers — the doctrine is a court-created doctrine, "implied [from the constitution's separate articles]."[4]

Second, this is not a case where the governor's veto was of such a magnitude that it underfunded the judicial branch to such an extent that the courts could not continue to meet their constitutional mandates.  In this case, the governor's line-item veto reduced the court system's budget by $334,700.

Third, and of the greatest concern, the court's opinion holds that the separation of powers "doctrine may be violated by a governor's use of the veto power with the intent of pressuring the courts to rule in a particular way."[5]  And how is one to determine this malign intent?  The court says that a recall petition's mere allegation that the governor " 'improperly us[ed] the line-item veto to attack the judiciary and the rule of law' is legally sufficient."[6]  The court, purporting to apply a "prima facie" standard, accepting the allegations of "improper" intent as true, leaves it to the voters to assess the truth of the allegation.[7]

The court here makes an egregious error.  Nowhere in its opinion does the

---

[3]  Opinion at 40-41, 49.

[4]  *Pub. Def. Agency v. Superior Court, Third Judicial Dist.*, 534 P.2d 947, 950 (Alaska 1975).

[5]  Opinion at 49.

[6]  Opinion at 49-50.

[7]  Opinion at 19, 49-50.

court actually conclude that the governor's line-item veto of such a small portion of the court system's budget violates the separation of powers, nor does the court conclude the governor illegally used the line-item veto to attack the judiciary and the rule of law.

In *von Stauffenberg v. Committee for Honest & Ethical School Board* we held that allegations in which the recall targets were merely "properly exercising the discretion granted to them by law" were insufficient grounds for recall.[8] Unless and until the court actually determines that the governor's vetoes violated the Alaska Constitution, that the governor did not legally exercise the discretion granted to him by the constitution, he cannot be subject to recall. The governor, and the citizens of Alaska, are entitled to a legal determination whether the governor's exercise of his constitutional discretion was valid. This determination is a legal decision that only the court can make.

The court abdicates its responsibility and leaves it to the voters to decide this question of law. The court further abdicates its responsibility in failing to determine the legal question whether the governor's line-item vetoes actually violated the separation of powers doctrine. Even accepting arguendo that a line-item veto might violate the separation of powers doctrine, the court does not conclude that in this case the governor's line-item veto was such a violation. It is my contention that the court must first determine if the governor actually did violate a constitutional threshold — only then can the voters decide if that violation merits recall. But the court leaves it to the voters to make these legal constitutional determinations. The court correctly notes that the constitutional framers rejected leaving the scope of the voter's right to recall to the voters themselves.[9] The framers instead left the

---

[8]    903 P.2d 1055, 1060 (Alaska 1995).

[9]    Opinion at 7-10.

-56-                                                          7542

task of determining the grounds for recall to the legislature,[10] and the legislature adopted by statute the four grounds discussed in the main opinion.[11] We have previously observed, and do so again today, that the four statutory grounds can be ambiguous and that "more carefully drawn statutes" could "decrease the need for judicial involvement."[12] We have also explained that "[t]he political nature of the recall makes the legislative process, rather than judicial statutory interpretation, the preferable means of striking the balances necessary to give effect to the Constitutional command that elected officers shall be subject to recall."[13] Truer words cannot be spoken.

I urge every legislator to carefully consider the court's opinion today. The opinion opens the door to standardless recall petitions. The court repeatedly says that Alaska courts are to apply the "prima facie" standard to recall petition allegations and, accepting the allegations as true, if any logical connection can be made between an allegation and a statutory ground for recall, the petition must be found to be legally sufficient.[14] I urge the legislature to, at the least, provide specific statutory definitions for the recall grounds to decrease the opportunity for judicial involvement in what is best done by the legislature — that is, legislating. This is not a partisan issue. The greatly expanded access to recall created by the court's decision today can and will be used not to actually seek to recall an elected official for cause, but instead to seek to recall an

---

[10]     Alaska Const. art. XI, § 8; Opinion at 10.

[11]     AS 15.45.510.

[12]     *Meiners v. Bering Strait Sch. Dist.*, 687 P.2d 287, 296 (Alaska 1984); Opinion at 25.

[13]     *Meiners*, 687 P.2d at 296.

[14]     *See*, *e.g.*, Opinion at 20, 24.

elected official because of disagreements over policy. And in Alaska, disagreement over policy or political philosophy is not a proper subject for recall.

In my view, the governor did not violate the separation of powers by using his constitutional discretion to line-item veto a small portion of the court's budget. Rather, it is the court that violates the separation of powers, by intruding on and interfering with a power expressly granted to another branch of government — the governor's express constitutional authority to exercise his discretion to veto or reduce a legislative appropriation.

The doctrine of separation of powers prohibits one branch of government from "exercis[ing] any power that is not explicitly bestowed by the constitution or that is not essential to the exercise of that power."[15] In doing so, it "avoid[s] . . . tyrannical aggrandizement of power by a single branch of government through the mechanism of diffusion of governmental powers."[16] But it also "limits the authority of each branch to interfere in the powers that have been delegated to the other branches" and, by doing so, "safeguard[s] the independence of each branch of government."[17]

By permitting voters to recall the governor because he exercised a power explicitly bestowed on him by the constitution, the court interferes with the power delegated to the executive branch. In so doing the court unconstitutionally aggrandizes its own power and imperils the independence of another branch of government. The court's decision undermines Alaska's constitution and the separation of powers. I therefore dissent from this part of the court's opinion.

---

[15] 16A AM. JUR. 2D CONSTITUTIONAL LAW § 236 (2020).

[16] *Brandner v. Hammond*, 553 P.2d 1, 5 (Alaska 1976).

[17] *Alaska Pub. Interest Research Grp. v. State*, 167 P.3d 27, 35 (Alaska 2007).